# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LOUIS NATALE, DANIEL RUVIN,    :    Hon. Joseph H. Rodriguez
MICHAEL DALLAS, BETTY BARNES,
ALFRED DITULLIO, HARVEY SKLAR,  :    Civil Action No. 13-4896
ALBERT JOHN ELLOR,
FRANK HIGGINS, ANTHONY MARINO,:
STEPHEN PERRY, LINDA BURGER,
ANTHONY ROMANO,            :

      Plaintiffs,           :        OPINION

    v.                   :

MISSION SOLUTIONS LLC       :
d/b/a/ MISSION SOLUTIONS
ENGINEERING,               :

      Defendant.          :

This employment discrimination matter is before the Court on eleven separate motions for summary judgment filed by Defendant Mission Solutions LLC ("MSE" or "Defendant"). Oral argument was heard on the motions on March 9, 2016 and the record of that proceeding is incorporated here. For the reasons placed on the record that day, and those set forth below, six of the motions will be granted and five will be denied.

**Background**

MSE is a supplier of systems engineering, software engineering, and systems integration services and products for the United States Government defense systems. In December 2011, MSE announced to its employees that it planned to implement workforce reductions because of decreased governmental funding. On January 6, 2012, MSE notified Plaintiffs they were being terminated as part of a reduction in force necessitated by diminished business needs resulting from a reduction in contracted and projected business. MSE did not provide any specific explanation to the twelve Plaintiffs as to why they in particular were selected for termination. Defendant contends here, however, that in deciding which employees to lay off, MSE followed a ranking process which was a regular part of employee reviews. Employees with each department were ranked by their overall value to the organization. Those selected for termination were first evaluated to determine whether their skills would enable them to fill any other position in the company. MSE had approximately 500 employees at the time the Plaintiffs were notified of their termination and selected 68 people for termination as part of the reduction in force.

Plaintiffs have alleged MSE targeted older employees for termination as part of the reduction in force, and that MSE's selection of Plaintiffs for termination was part of a broader plan by MSE to reduce the age of its workforce. (Compl., ¶¶ 21-27.) Plaintiffs filed a Complaint in this matter on August 14, 2013 alleging employment discrimination based on age in violation of the ADEA and NJLAD.

**Summary Judgment Standard**

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under

the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade the court that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor. Doe v. C.A.R.S., 527 F.3d 358, 362 (3d Cir. 2008).

**ADEA**

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (reaffirming the application of a "slightly modified version of [McDonnell Douglas] in ADEA cases").[1]

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. Keller, 130 F.3d at 1108 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)). Satisfying the *prima facie* elements creates an "inference of unlawful discrimination." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (quoting Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)). The elements of a *prima facie* case of age discrimination in an ordinary employment termination matter are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

"[D]iscrimination clams resulting from a RIF differ from a decision to fire an employee." Tomasso v. Boeing Co., 445 F.3d 702, 711-12 (3d Cir.

---

[1] "Age discrimination claims under the ADEA and LAD are governed by the same standards and allocation of burdens of proof." Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 65 (3d Cir. 1996).

2006). "The fourth element [of a prima facie case is intended to be flexible and] must be relaxed in certain circumstances, as when there is a reduction in force." Pivirotto, 191 F.3d at 357 (internal quotation omitted). "In the context of a reduction in force, in order to satisfy the fourth element of a prima facie case under the ADEA, a plaintiff must show that the employer retained a sufficiently younger similarly situated employee." Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 301 (3d Cir. 2004) (citing Anderson v. Consolidated Rail Corp., 297 F.3d 242, 250 (3d Cir. 2002)). [2] [3] [4]

---

[2] An employee is "similarly situated" when the evidence supports a claim that the plaintiff and a retained employee shared comparable duties. Id. "This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." Monaco, 359 F.3d at 305; see also Opsatnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 222–23 (3d Cir. 2009) ("While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'") (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)); Lepore v. Lanvision Sys., Inc., 113 Fed. Appx. 449, 452 (3d Cir. 2004) (opining that similarly situated employees "work in the same area in approximately the same position") (citing Anderson, 297 F.3d at 249–50).

[3] "In order for a plaintiff to satisfy the 'sufficiently younger' standard, . . . there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'" Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (quoting Sempier, 45 F.3d at 729 (citations omitted)).

[4] The Third Circuit has also stated that "where an employee is terminated during a RIF, the fourth element of the *prima facie* case becomes whether the employee retained employees who do not belong to the protected class." Tomasso, 445 F.3d at 706 n.4.

In such a case, "subjective criteria take on a greater significance as the employer looks to draw finer distinctions between employees. Thus, subjective categories such as 'attitude' and 'teamwork' need to be viewed not just in light of the warning against such criteria [being used as a mask for discrimination] articulated in Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313 (3d Cir. 2000), but also in light of the fact that employers must distinguish otherwise competent employees." Tomasso, 445 F.3d at 711 (Roth, J. concurring in part and dissenting in part).

Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must "articulate a legitimate nondiscriminatory reason for the adverse employment action." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999) (citing Keller, 130 F.3d at 1108). This second step of McDonnell Douglas does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). "[A]t the pretext stage, it is not a court's role to 'rule on the strength of cause for discharge. The question is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason is [discrimination].'" Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 647 (3d Cir. 2015) (quoting Keller, 130 F.3d at 1109).

The Third Circuit, in Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644-45 (3d Cir. 2015), recently expounded on the third step of the analysis as follows. If the employer satisfies this second step, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual. Burton, 707 F.3d at 426–27. In Fuentes, the Circuit recognized two ways in which a plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reason was pretextual. 32 F.3d at 762. The first way to show pretext is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action. Id. at 765. In order to raise sufficient disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons. Id. Alternatively, the second way a plaintiff can establish pretext is to point to evidence that would allow a factfinder to believe that an invidious

discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action. Id. at 764. Specifically, the plaintiff can show pretext this way by presenting evidence "with sufficient probative force" so as to allow the factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor." Simpson v. Kay Jewelers, 142 F.3d 639, 644–45 (3d Cir. 1998) (citing Keller, 130 F.3d at 1111). Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765). If this step is satisfied, at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination. Fuentes, 32 F.3d at 763 (quoting St. Mary's Honor Ctr., 509 U.S. at 515). Ultimately, to succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009).

The "inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee." <u>Healy v. New York Life Ins. Co.</u>, 860 F.2d 1209, 1216 (3d Cir. 1988) (citing <u>Thornbrough v. Columbus and Greenville Railroad Co.</u>, 760 F.2d 633, 647 (5th Cir. 1985) ("The ADEA was not intended to be a vehicle for judicial second-guessing of business decisions, nor was it intended to transform the courts into personnel managers.")).

It is undisputed that each of the Plaintiffs maintained satisfactory job performance and was qualified for the position held at the time of termination. Each Plaintiff also has alleged that at the time of termination, MSE retained one or more similarly situated employees who were younger and less qualified or experienced.

**Analysis**

**A. MSE & the RIF**

MSE provides full-service systems and software engineering, in addition to system integration services and products, for real-time, mission critical Defense Systems of the United States Government. (Gwyn Decl. ¶ 1.) MSE's capabilities encompass the life cycle of software development with functional area expertise in all phases – from requirements specification and analysis to design, coding, integration testing and installation support.

(Gwyn Decl. ¶ 2.) MSE is divided into multiple different departments, each of which is responsible for a different function related to the services and products MSE provides to its customers. (Gwyn Decl. ¶ 3.)

MSE was created in 2009, when Computer Sciences Corp. ("CSC") separated an engineering team from the rest of the company. (Gwyn Decl. ¶ 4.) At that time, employees of CSC became an MSE employees. (Gwyn Decl. ¶ 4.)[5]

During the time period at issue, MSE's management structure had Executive Management at the top of its organization. (Ryan Dep. p. 9-10.) This level consisted of President Timothy Caswell, Senior Vice President Michael Knowles, and Vice Presidents Charles Zimmerman, Catherine Urban, and Timothy Breeyear. (Ryan Dep. p. 9-10; Knowles Dep. p. 10-11.) Below the Executive Management level, MSE's management consisted of Directors, followed by Department Managers reporting to the Directors, and Section Managers reporting to the Department Managers. (Ryan Dep. p. 10.)

In 2011, MSE faced a reduction in business due to reduced Department of Defense spending. (Caswell Dep. p. 38-39; Knowles Dep. p.

---

[5] Following its separation from CSC, MSE was eventually sold in October 2010 to an unaffiliated company. (Gwyn Decl. ¶ 6.)

38.) Along with the reduced business, MSE's pipeline of new business also did not have a vast scope of new assignments for its employees. (Knowles Dep. p. 38-39.) Consequently, MSE did not have sufficient work for the number of individuals it employed at the time. (Knowles Dep. p. 39; Caswell Dep. p. 39.) Based upon a recommendation from Knowles, Caswell made the decision to have a reduction in force. (Caswell Dep. p. 40.)

MSE states that Directors used the 2012 demand projections for each Department to balance the reductions across the company in accordance with projected demand rather than simply using a flat reduction percentage for each Department. (Def. Answers to Interrogs. #3.) To determine which employees would be laid off in the reduction in force, MSE represents that it relied on its annual review process of ranking employees in what it called "ladders." (Knowles Dep. p. 44, 48; Ryan Dep. p. 21-22.) Under this process, MSE represents that Department managers ranked employees within each Department, also known as "organizations," according to their value to the organization based on job performance, skill sets, and function. (Knowles Dep. p. 49.) After reviewing the ladder rankings for each Department, MSE's Directors identified employees who would be included in a reduction in force by looking at the bottom portion of employees in each organization. (Def. Answers to Interrogs. #3.) Directors then allegedly

reviewed the skills of the individuals identified for layoff to determine if any of them had skills that would allow them to be transferred into other departments. (Def. Answers to Interrogs. #3.; Ryan Dep. p. 22, 43.) Ultimately, on January 6, 2012, MSE laid off 68 employees in the reduction in force. (Gwyn Decl. ¶ 7.)

Plaintiffs argue that age was a factor in the ladder rankings. They contend that managers were able to exercise ageist bias because MSE failed to provide its managers with clear, consistent direction or oversight in making termination decisions as part of the RIF.

Without considering whether age may have been an unspoken factor in the ladder rankings, it appears that MSE instructed its managers about the procedure used to rate and rank employees. Caswell confirmed that MSE followed ASRC federal procedure pertaining to involuntary termination at the time of the RIF. (Caswell Dep. p. 93-94.) The written policy states "management reserves the right to alter the layoff procedure to assure an adequate level of service." (Id.) Knowles testified that MSE followed this "exception" to the ASRC policy by utilizing the MSE ratings and ranking process. (Knowles Dep. p. 112. See also Lane Dep. p. 78-81.) Similarly, Ryan testified that MSE was compliant with ASRC policy by obtaining approval to use MSE's standard process of ratings and ladder

ranking. (Ryan Dep. p. 112.) Caswell explained that MSE "altered" the ASRC procedure to make sure it had a "workforce that was capable of meeting the projected work." (Caswell Dep.  p. 94.) Subjective judgment in the ratings and rankings is inherent, and has been acknowledged by MSE management.

Peterman, department manager of C&D, identified "three employees who come to the top of my head for a selective RIF" two months before ladder rankings for the RIF were requested. Ex. P-96; P-15. All three employees identified by Peterman for RIF were over the age of 50, and all were in fact eventually terminated in the RIF. Ex. P-96; Ex. P-1.[6] Similarly, Terrell Nale, manager of WCS, identified five employees to be terminated in the RIF in an e-mail to Goehrig, his Director, separate from any ladder ranking. Ex. P-96; Nale Dep. p. 41-42. All five employees identified by Nale for termination were in fact terminated in the RIF and over the age of 50. Ex. P-36; Ex. P-1.

Additionally, Plaintiffs argue that the Court should consider the "evidence of an ageist culture at MSE" that they have presented as a

---

[6] There is one Plaintiff from the Command and Control Department. Anthony Romano, a Senior Computer Scientist, was employed by MSE and/or its predecessor for over 22 years; he was 52 years old at the time of his termination. No motion has been filed regarding this Plaintiff.

sufficient basis for a reasonable jury to find MSE's reasons for their terminations are pretext for age discrimination. "[A] plaintiff may offer circumstantial proof of intentional discrimination on the basis of age in the form of a supervisor's statement relating to formal or informal managerial attitudes held by corporate executives." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132 (3d Cir. 1997) (citations omitted). The defense argues that this evidence constitutes, at best, stray remarks by non-decision makers or by decision makers unrelated to the decision process. See Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999). The Third Circuit has cautioned:

> [I]t is often crucial to the jury's assessment of whether the employer's reasons were pretextual and the ultimate question whether the employer intentionally discriminated against an employee. Its importance seems to become ever more critical as sophisticated discriminators render their actions increasingly more subtle to circumvent adverse judicial precedent.

Ryder, 128 F.3d at 132 (citations omitted). The Court outlines the comments here.

CEO Tim Caswell made an allegedly derogatory remark about an employee's age when presenting him with a service award. (Knowles Dep. p. 227-228; Ryan Dep. p. 137-38; Zimmerman Dep. p. 120-22.) While no one recalled the exact comment, perhaps regarding the employee's senior status on the project, and no one testified to the timing of the comment in

relation to the RIF, all deposed understood it to have been made in jest. (Knowles Dep. p. 227-228; Ryan Dep. p. 137-38; Zimmerman Dep. p. 120-22.) Further, Caswell played no role in selecting the employees for termination in the RIF. (Caswell Dep. p. 48.)

At some point in 2011, George Reichl, had a discussion with Plaintiff Linda Burger regarding MSE's new office space. Burger expressed concern that the proposed low partitions would result in too much noise. Reichl referred to a reference book used in the design of office spaces and stated, "It's not about you and me anymore . . . the younger people work better in this type of environment, and we want to set up the office to work better for the younger people. (Burger Dep. p. 14-15.) Reichl's recollection was that some of the designs were "[n]ot necessarily for younger folks, but to be more collaborative to what the people that we were hiring out of school are used to working in or would want to work in." (Reichl Dep. p. 145.) "[I]t was really explained to me [by outside consultants] how the office of 2010 or 2015 or 2025 could be outfitted to better facilitate people. (Id. p. 145-46.)

Jim Peterman, Department Manager of the Command & Decision Department, made a list of employees he recommended for termination with the notations "50 something programmer" or "50 yr old rookie programmer" next some of the listed employees. Subsequently, his Director

William Goehrig forwarded the file containing the notations to other Directors. Barnes's Department Manager, Brencher, did not receive this document, nor did Palazzo or Ryan. (Palazzo Dep. p. 112-13; Ryan Dep. p. 66.) Knowles, and Zimmerman had no recollection of having seen the document with Peterman's notes. (Knowles Dep. p. 164; Zimmerman Dep. p. 91, 96.)

Thereafter, Goehrig spoke to Peterman about the notes, indicating that they were inappropriate. (Peterman Dep. p. 161.) Goehrig also told Peterman "to stick to the facts, strictly performance, don't add anything else . . . that's what the ladder is about, it's about strictly performance." (Id.) When asked if Goehrig explained why it was inappropriate, Peterman testified:

> I know the reason why. Like I said, I don't know why I did it that day. It's redrilled in our head annually through PMI and through CSC or ASRC as far as ethical – age discrimination, race discrimination. We get that – we have that awareness.
>
>        *     *     *
>
> But again, it was based on performance and if age was a factor or people's salaries was a factor, then this list would have been a lot bigger. It was strictly performance.

(Peterman Dep. p. 161-62.) "The age notation . . . indicates that individuals involved in the termination decision were aware of plaintiff's age at the time of that decision. The notation does not, in itself, manifest discriminatory animus, though it may be relevant to such a showing when

considered in light of other evidence." Connolly v. Pepsi Bottling Grp., LLC, 347 Fed. Appx. 757, 761 (3d Cir. 2009).

Plaintiff Stephen Perry overheard, in passing, Charles Zimmerman, a Vice President, remark to the effect of removing "dead wood" from programs that were ending. (Perry Dep. p. 75-76.) Courts have determined that the term "dead wood" is not necessarily age-related. See, e.g., EEOC v. Clay Indus., 955 F.2d 936, 942 (4th Cir. 1992) (discussing how a supervisor's comment about "deadwood" referred to employee evaluations, regardless of age); Wado v. Xerox Corp., 991 F. Supp. 174, 202 (W.D.N.Y. 1998) ("'Dead wood' implies employees who are unproductive or superfluous," and "could just as easily include younger employees as older employees.").

Within months of the RIF, Michael Knowles questioned Plaintiff Harvey Sklar once or twice about his age and told him in front of his colleagues, "If I was your age, I would be out on a golf course or somewhere," or words to that effect. (Sklar Dep. p. 55-56, 68-71, 79-80.) Similarly, Section Manager Nick Petro frequently asked Plaintiff Frank Higgins about retirement, stating "he couldn't understand somebody who had all of the money that [Higgins] had, why [he] didn't retire." Higgins was not offended by the comments. (Higgins Dep. p. 295-97.) "[I]t is a

common business practice, and not impermissible discrimination, for an employer to inquire about retirement plans in anticipation of staffing needs." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 649 (3d Cir. 2015).

Finally, Plaintiffs have presented an expert report that concludes that the RIF resulted in a statistically significant disproportionate number of older employees laid off. MSE rebuts this evidence by its own expert report that concludes that when broken down by department, age is not a statistically significant factor. "The Court may not at this stage weigh competing evidence, nor decide which evidence is more probative." Scott v. IBM Corp., 196 F.R.D. 233, 250 (D.N.J. 2000), as amended (Nov. 29, 2000) (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995)).  Further, while the Court appreciates that an employer is entitled to conduct a RIF on a department by department basis, and therefore a statistical analysis should be broken down accordingly, statistics may be used to establish a prima facie case of discrimination. If the Court therefore assumes that Plaintiffs establish a prima facie case by relying on their expert report, the Court must then turn to whether the legitimate, nondiscriminatory reasons given in each case were pretextual.

## B. The Quality Assurance Department

During the relevant time period, MSE maintained a Quality
Assurance ("QA") Department, which was comprised of two different
sections: the production section and the development section. (Brencher
Dep. p. 19-20.) The production section of the QA Department was
responsible for "ensuring that all . . . the customer requirements for
developing software code are being followed," by "participating in many of
the development check points and auditing them against defined criteria."
(Brencher Dep. p. 19-20.) The development section of the QA Department
was responsible for conducting quality assurance audits for computer
programs, and completing checklists to ensure that all the defined criteria
were met. (Brencher Dep. p. 20.)

From 2007 until 2012, Patricia Brencher was Quality Assurance
Senior Manager responsible for the QA Department. (Brencher Dep. p. 13.)
Brencher reported to Tony Palazzo (then-Delivery Assurance Director).
(Brencher Dep. p. 16.) There were two Section Managers in the QA
Department, both of whom reported directly to Brencher – Paul Nocito
(Section Manager of the QA development section) and Susan Goldberg
(Section Manager of the QA production section). (Brencher Dep. p. 16, 18;
Barnes Dep. p. 54; 2011 QA Organizational Chart.) In addition to Nocito

and Goldberg, two technical lead employees also reported directly to Brencher: Diana Zipf and Linda Kinslow. (Brencher Dep. p. 16, 18.)

In the QA Department, the Section Managers – Nocito and Goldberg – completed the performance appraisals for the employees who reported to them, and Brencher would review the appraisals for form and content. (Brencher Dep. p. 23-24, 36.) Brencher instructed Nocito and Goldberg to rank employees based on skills, quality of work compared to job level, and value to the company. (Brencher Dep. p. 38-39.) Brencher did not recall ever changing the employee rating selected by Nocito or Goldberg. (Brencher Dep. p. 24.) The only performance appraisals Brencher completed on her own were the appraisals for her for direct reports: Nocito, Goldberg, Zipf, and Kinslow. (Brencher Dep. p. 23, 36.) Palazzo reviewed and approved the appraisals for Brencher's direct reports, but he had no involvement with the appraisals for the QA employees under Nocito and Goldberg. (Brencher Dep. p. 25.)

Nocito and Goldberg sent the ladder rankings for their direct reports to Brencher, who "zippered" Nocito and Goldberg's ladder rankings together, attempting to alternate production section employees and development section employees to obtain a balance between the two sections. (Brencher Dep. p. 36-37.) Brencher then added her four direct

reports to the list, ranking them based upon their "value to the organization as a whole." (Brencher Dep. p. 37.)

At the time of the January 2012 reduction in force, there were eighteen employees in the QA Department. (Barnes Dep. Ex. 4.) Following her submission of the first set of ladder rankings, Brencher discussed them with Palazzo in mid-December. (Brencher Dep. p. 44.) The only difference between the original QA Department ladder ranking Brencher submitted and the Final QA Department Ladder Ranking was that two individuals – Linda Kinslow and Joanne Constantino -- had been swapped, both of whom were ranked above Plaintiffs Barnes and Dallas on both versions of the ladder ranking. (Brencher Dep. p. 46; Palazzo Dep. p. 67.)[7] Ultimately, Brencher learned from Palazzo that six employees in the QA department would be laid off in the reduction in force. (Id.)

1. **Betty Barnes** [Motion at docket entry 31]

Betty Barnes was employed by MSE and/or its predecessor for more than 13 years; she was 64 years old on the date of her termination. (Barnes Dep. p. 61, 10.) In approximately 1998, Barnes began working as a "configuration management specialist," which she describes as a "software

---

[7] This change was made to preserve a production group position (Constantino) and include Kinslow on the termination list, as she had been "below the line in the development group." (Palazzo Dep. p. 67.)

support" role. (Barnes Dep. p. 35.) In approximately 2008, Barnes was transferred to the development section of the QA Department. (Barnes Dep. p. 40; 54-55.) She characterized her tasks as monitoring design and code inspections, keeping track of weekly and monthly metrics, and assigning members of her group to perform audits, ensuring the individuals completing them were adhering to the requisite processes and procedures.[8] (Barnes Dep. p. 55, 62, 52-53.) She was the only person in the QA Department responsible for her support duties, and she was the only person in the QA Department in that particular role. (Barnes Dep. p. 53.)[9]

During her time in the QA Department, Barnes claims she reported directly to Brencher, who was the QA Department Manager at the time. (Barnes Dep. p. 43-44.) Barnes did not understand that Nocito (QA Section Manager for the development section) was her direct supervisor during her employment, and testified that she had no knowledge regarding Nocito's role, aside from the fact that she would sometimes assign tasks to him, as

---

[8] Brencher testified that Barnes "occasionally" performed audits for "very small, simple" matters. (Brencher Dep. p. 32.)

[9] Barnes's co-plaintiff, Michael Dallas, who also worked in the development section of the QA Department, testified, when asked whether all the individuals in the development section had the same responsibilities: "A lot of the work we did sort of overlapped. . . . I mean, some people like Betty Barnes really didn't do the same kind of work I did; she was more or less like an administrative-scheduler type person." (Dallas Dep. p. 34-35.)

she did the other employees in the QA Department. (Barnes Dep. p. 44; 57-58.) Nocito signed Barnes's performance appraisal as "Appraiser" and approved her timesheets, and Barnes never observed anyone else in the QA Department approving paperwork. (Barnes Dep. p. 62-63, 78, Ex. 6.)

In her 2011 performance appraisal, Barnes received an "average" rating of "3" or "Meets Expectations." (Barnes Dep. Ex. 6; Brencher Dep. p. 24.) Nocito completed the appraisal, and Brencher approved it. (Id.) Barnes confirmed that all the statements and ratings in her 2011 performance appraisal are accurate. (Barnes Dep. p. 74-76.)[10] In the ladder ranking Brencher prepared, Barnes ranked fifteenth of the eighteen employees. (QA Ladder Ranking.)

The justification given for Barnes's selection for layoff was that her position was being eliminated as a result of "reduced client contract work," and that Barnes had not demonstrated her abilities in the areas of "strong quality assurance skills, strong auditing and procedure writing skills, customer facing capability, [and] ability to meet tight schedules and high productivity levels . . . at the level of her co-workers as evidenced by

_____

[10] Nocito received a rating of "2" or "Occasionally Exceeds Expectations" on his 2011 performance appraisal. (Brencher Decl. ¶ 1.) A performance rating of a "2" was higher than a performance rating of a "3." (Brencher Dep. p. 24-25.) Brencher completed Nocito's appraisal, and Palazzo approved it. (Brencher Decl. ¶ 2.)

department rankings." (QA Ladder Ranking; <u>see</u> <u>also</u> Barnes Dep. p. 89-90.)

Following Barnes's layoff, the audits on which she worked were distributed among the remaining employees in the QA development sections. (Brencher Dep. p. 33.) Nocito, the Section Manager, took over the scheduling and assigning of tasks that Barnes had performed. (<u>Id.</u>) He was 46 years old at the time; Palazzo was 68 years old, and Brencher was 50 years old. (Gwyn Decl. ¶ 8.)

Defendant argues that Barnes cannot establish a prima facie case because she has no evidence that can create an inference of discrimination. When asked whether she believes MSE discriminated against her because of her age, Barnes responded, "I don't know." (Barnes Dep. p. 139.) Rather, when she heard about the number of older MSE employees who had been laid off as part of the RIF, she "thought it was strange." (Barnes Dep. p. 142.)

When asked to identify which individuals on the QA Department final ladder ranking she believed were less qualified than she was, Barnes answered: "I really don't know. Because I didn't work with these people on a one-on-one on a daily basis, you know, like grab hold, no, I never did that." (Barnes Dep. p. 86.) When asked whether she believed any

individuals on the ladder ranking should have been ranked lower than she was, Barnes answered, "That I couldn't tell you." (Id.) Barnes testified: "All I know is they worked in part Configuration Management QA. To get into the detailed part of their job, I never did." (Id.)

Paul Nocito, the Section Manager who supervised her, is the only individual whom Ms. Barnes identifies as someone who was retained during the reduction in force who was younger and less qualified than she was, and who completed the same tasks (monitoring design and code inspections and keeping track of metrics) as she did at the time of the layoff. (Barnes Dep. p. 79-81; Pl. Answers to Interrogs. #8, 10, 11.) The record indicates, however, that Nocito actually was not similarly situated to Barnes, but was a Section Manager.

Barnes next argues that seven other younger configuration management specialists in the company, including Gaynelle Johnson (for whom Barnes would sometimes act as a backup), were retained. Barnes has failed to present evidence, however, that these individuals' job duties were comparable to her own or were otherwise similarly situated beyond having the same job title. In fact, Barnes testified that she had "no idea" what Johnson's position entailed or whether they performed the same role at MSE. (Barnes Dep. p. 56, 67.) Further, "an employer has no duty under

ADEA to permit an employee to transfer to another position or to displace workers with less seniority when the employee's position is eliminated as part of a work force reduction." Barnes v. GenCorp Inc., 896 F.2d 1457, 1469 (6th Cir. 1990).

The record indicates that Barnes' position was eliminated as part of the RIF and includes no indication that the reasons given for Barnes' termination were pretextual. Rather, there is evidence that when she was evaluated, Barnes was found to be less qualified than others in her department to fulfill the future needs of the organization.

Barnes argues that her expert's statistical report shows pretext. However, there is no evidence that older employees within Barnes's department were laid off in higher numbers than younger employees; rather, they were laid off at approximately the same rate. Further, "[w]hile statistical evidence in discrimination cases may support an inference of discrimination, such evidence must be linked to other evidence which also supports discriminatory intent. If such additional evidence is lacking, the statistical evidence alone cannot be conclusive of discriminatory intent." Bradley v, United States, 164 F. Supp. 2d 437, 446 (D.N.J. 2001). See also Barnes v. GenCorp Inc., 896 F.2d 1457, 1469 (6th 1990).

The Court is mindful of the instruction from the Third Circuit that evidence of discrimination must be considered in the aggregate. See Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir. 1997).  Assessing the record in the light most favorable to Barnes, however, the Court finds that she has failed to show, by a preponderance of the evidence, that the legitimate, nondiscriminatory reasons advanced by MSE for her termination were pretext for discrimination. Even considering the totality of the evidence, Barnes has not met her burden of showing that a reasonable factfinder could disbelieve MSE's reasons for her termination or believe that invidious discrimination more likely than not motivated MSE. Accordingly summary judgment will be granted in favor of MSE on Barnes's claims.

**2. Michael Dallas** [Motion at docket entry 37]

Michael Dallas was employed by MSE and/or its predecessor for more than 15 years; he was 52 years old on the date of his termination; he was a Senior Quality Engineer at the time. (Dallas Dep. p. 46.)

Dallas worked in the QA Department as an engineer within the development section from the time of his hire in 1997. (Dallas Dep. p. 21.) In that role, Dallas's responsibilities included attending code and design inspections and providing feedback as to the findings of those inspections, and reviewing and approving requests for exceptions ("RFEs") (requests for

waiver to deviate from the standard procedures in order to meet a deadline or for some other reason) for the development section. (Dallas Dep. p. 37-38, 60-61.) Beginning in approximately 2010, Dallas reported to Section Manager Paul Nocito. (Dallas Dep. p. 29, 31.)

In his 2011 performance appraisal, Dallas received an "above average" rating of 2 or "occasionally exceeds expectations." In the ladder ranking Brencher prepared, Dallas ranked fourteenth of the eighteen employees. (QA Ladder Ranking.) Dallas argues that the justification for his termination originally included a lack of management and training skills, Ex. P-63, but that changed over time. The final justification given for Dallas's selection for layoff was that he had not demonstrated his abilities in the areas of "support tools programming/analysis/design/test/debug skills, ECM skills, ability to multi-task and meet tight schedules with high productivity levels . . . at the level of his co-workers as evidenced by department rankings." (QA Ladder Ranking; Brencher Dep. p. 53.)

Brencher stands by the assessment that Dallas's abilities were not at the level of his co-workers who were ranked higher in the department. (Brencher Dep p. 53.) Brencher found Dallas to be "an adequate worker," who, in general, would meet deadlines, although sometimes she would have to inquire as to why his audits were not complete. (Brencher Dep. p. 29-

30.) Additionally, there were times when Brencher could not find records of audits that Dallas had produced and he was spoken to about that. (Brencher Dep. p. 30-31.)

Within the QA development section in which Dallas worked, MSE retained five employees following the January 2012 reduction in force: Diana Zipf, age 46, Michael Krupa, 44, William West, 69, Aavo ("Al") Janes, 70, and Paul Nocito, 46. (QA Ladder Ranking; Gwyn Decl. ¶ 8.) All of these individuals were ranked higher than Dallas on the ladder ranking. (QA Ladder Ranking.) Following Dallas's layoff, his responsibilities were absorbed by the remaining individuals in the QA development section. (Def. Answers to Dallas's Interrogs. #5; Brencher Dep. p. 31.)

Dallas identified four individuals as being treated more favorably than he was on the basis of their age when they were not terminated in the RIF: Nocito, Krupa, Zipf, and Linda McGovern, age 49 at the time. (Pl. Answers to Interrogs. #8.) Nocito was a Section Manager for the QA development section and, consequently, was Dallas's immediate supervisor so not similarly situated. (Dallas Dep. p. 65.) McGovern worked in the QA production section, and Dallas admitted that McGovern's job was "different from [his]." (Dallas Dep. p. 69.) Thus, of the four employees identified, the

only individuals Dallas claims performed the same duties as he did are

Krupa, 44, and Zipf, 46. (Dallas Dep. p. 65, 69.)

Brencher testified to why Krupa and Zipf were ranked in their

respective positions in the QA ladder ranking:

> Q.   Why is Michael Krupa ranked where he is?
>
> A.   Remember when I said outside duties and additional tasks?
> Mike was real go-to person for pop-up high priority items that
> the customer needed. Mike also was the co-chair of our defect
> prevention committee, which is a very high profile committee
> with the customer and required for our CMMI evaluation.
>
> Q.   Why is Diana Zipf ranked where she is?
>
> A.   Diana brought with her a high level understanding of high
> maturity metrics and had a skill set where she could produce
> those. She – and high maturity metrics is also involved with our
> CMMI evaluation. She also had demonstrated in the past
> leadership skills in terms of being the main point of contact
> with the customer on the DDG-1000 effort. She also had good
> writing skills.

(Brencher Dep. p. 53-54.)

In addition, Zipf was only six years younger than Dallas, so not

sufficiently younger to support his claim.  See Robinson v. City of

Philadelphia, 491 Fed. Appx. 295, 299 n.1 (3d Cir. 2012) (finding difference

of seven years not sufficient to establish age discrimination); Narin v.

Lower Merion Sch. Dist., 206 F.3d 323, 333 n.9 (3d Cir. 2000) (holding

that where the plaintiff was 56 and another job applicant was 49, the other

applicant's age did "not differ materially from [plaintiff's]," meaning that "we cannot conclude that [defendant] ultimately filled the . . . positions with someone sufficiently younger to permit an inference of discrimination").

Dallas is left, therefore, with only Krupa, age 44. However, Dallas, then 52, cannot choose to ignore MSE's retention of West, 69, and Janes, 70. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645-47 (3d Cir. 1998) (A plaintiff cannot selectively choose a comparator in the non-protected class who was treated more favorably, ignoring similarly situated members of the protected class.).

Nonetheless, MSE assumed for purposes of this motion that Dallas can establish a *prima facie* case of age discrimination.  The Court therefore turns to whether he can show that his layoff as part of the RIF is a pretext for MSE discriminating against him.

Much of Dallas's argument merely disagrees with MSE's assessment of his skills and whether certain skills actually were needed in his job. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). <u>See also</u> <u>Maull v. Division of State Police</u>, 39 Fed. Appx. 769, 774 (3d Cir. 2002) ("[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."). <u>Contra</u> <u>Stewart</u>, 120 F.3d at 434 (Departures from normal procedures might afford evidence of improper purpose.).

In addition, Dallas focuses on what he called a "pattern of . . . age bias," inasmuch as it seemed to him that of the individuals selected for layoff in January 2012, "a lot of them were older in general." (Dallas Dep. p. 124-25, 108-09, 110-11.)[11] Insofar as Dallas seeks to rely on statistical

---

[11] Dallas testified that believed his selection for layoff was based upon his age because he claims his coworker Zipf told him, in August 2011, that at an "upper-management meeting" in August 2011, Eric Velte (the Director of Solutions and Architecture, who did not oversee the QA Department) stated that "they needed to get rid of the dead wood." (Dallas Dep. p. 72, 92.) Dallas contends that he assumes this "comment was targeted at older staff." (Dallas Dep. p. 92-93.)

During her deposition, Zipf contradicted Dallas's version of the events. She testified that the meeting she discussed with Dallas was a technology change management group meeting, with the only management-level employee present being Velte. (Zipf Dep. p. 21-22.) Zipf also testified that Velte never used the phrase "dead wood," but rather asked if a project had been done by "high achievers or was it done by slogs." (Zipf Dep. p. 22.) Zipf did not take the comment to be age-related, but

evidence to prove a pattern of age bias, such statistics on their own are not sufficient to show discriminatory intent.  See Bradley, 164 F. Supp. 2d at 446-47; Barnes, 738 F.2d at 1469.

Dallas also relies upon the stray remarks discussed above to argue that he has established an ageist "atmosphere and context in which [the employer] made the employment decision." (Dallas Br. p. 19 n.8 (quoting Antol v. Perry, 82 F.3d 1291, 1301 (3d Cir. 1996). See also Antol, 82 F.3d at 1302 (Inconsistencies in statements or procedures may be used regarding pretext.).

Assessing the entirety of the record in the light most favorable to Dallas, however, the Court finds that he has failed to show, by a preponderance of the evidence, that the legitimate, nondiscriminatory reasons advanced by MSE for his termination were pretext for discrimination. Accordingly summary judgment will be granted in favor of MSE on Dallas's claims.

---

rather took the term "slogs" to be a reference to employees at MSE who were not high achievers. (Id.)

As an initial matter, this alleged statement by Velte is hearsay.  See Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 95-103 (3d Cir. 1999) (finding plaintiff's purported evidence of pretext to be hearsay, incapable of being admitted at trial, and therefore affirming summary judgment). Further, dead wood is not necessarily age-related. In briefing, Dallas states that he does not rely on this remark in opposing summary judgment. (Dallas Br. p. 18 n.7.)

## C. The Display Department

During the relevant time period, MSE maintained a Display Department that was responsible for providing computer programs for the display portion of the AEGIS program for the United States Navy. (Barna Dep. p. 21.) From approximately 2002 until 2013, Peter Barna was Department Manager for the Display Department. (Barna Dep. p. 13, 14.) The Department was administratively divided into several Sections, each with a Section Manager overseeing software developers. (Barna Dep. p. 21.) Barna oversaw a team of approximately six or seven Section Managers at a given time. (Barna Dep. p. 19.) Barna reported to Director of Technical Operations William Goehrig, who, in turn, reported to Senior Director George Reichl. (Barna Dep. p. 17; Goehrig Dep. p. 11; Reichl Dep. p. 9.)

In the Display Department, Barna testified that he held an in-person meeting every year with his Section Managers to discuss the ladder rankings. (Barna Dep. p. 36.) At the meeting, Barna and his managers discussed all of the employees in the Department and ranked them based on their value to the Department and to MSE as a whole. (Barna Dep. p. 36-37.) In assessing value, Barna looked to the employee's ability to perform the types of work that the Department had and expected to have. (Barna Dep. p. 37.) After completing the rankings, Barna reviewed them with

Goehrig. (Barna Dep. p. 43; Goehrig Dep. p. 28.) Reichl also reviewed the ladder rankings, although he did not recall making any changes to them. (Reichl Dep. p. 33-34.)

At the time of the January 2012 reduction in force, there were 76 employees in the Display Department. (Gwyn Decl. ¶ 7; Display Dep't Final Ladder Ranking.) Ultimately, Barna learned from Goehrig that five employees in the Display Department would be laid off in the reduction in force. (Barna Dep. p. 62-63.)

**Linda Burger** [Motion at docket entry 38]

Linda Burger was employed by MSE and/or its predecessor for more than 20 years; she was 56 years old on the date of her termination. (Burger Dep. p. 58.) At the time of her termination, Burger was a Software Engineer, Senior Professional in the Display Department. (Burger Dep. p. 20-21.) She was responsible for engineering software development, which required her to write code, attend meetings, and interact with clients. (Burger Dep. p. 34-35.)

Burger began working in the Display Department in February 1999 after previously working in another location for CSC. (Burger Dep. p. 29-32.) Although her job title changed over time, she held the position of programmer throughout her time in the department. (Burger Dep. p. 32.)

As a programmer, Burger analyzed requirements from MSE's customer, Lockheed Martin, developed code from the requirements, performed tests, and integrated and delivered the code. (Burger Dep. p. 35; Barna Dep. p. 30.) At the time of the reduction in force, Burger reported, administratively, to Section Manager Neal Klahn, who reported to Barna; she reported substantively to other Section Managers depending on the project; as such, Burger states she reported to Barna. (Burger Dep. p. 39, 41, 36; Barna Dep. p. 21.)

In her 2010 performance appraisal, Burger received an "average" rating of "3" or "Meets Expectations." In the 2010 Display Department ladder ranking, Burger was ranked 59. In her 2011 performance appraisal, Burger again received a rating of 3. In the final ladder ranking, Burger ranked 75 of the 76 employees. (Gwyn Decl. ¶ 7; Display Dep't Final Ladder Ranking.)

The Display Department's final ladder ranking described the justification for Burger's selection for layoff as follows:

> The skill set required to move into the future with MSE includes the following as well as the ability to perform duties in multiple roles and organizations: strong object orientation and C++ programming skills, strong analysis/design/test/debug skills, ability to meet tight schedules and high productivity levels. Ms. Burger has not demonstrated these abilities at the level of her co-workers as evidenced by department rankings. Ms. Burger's

> productivity is not on par with her peers. She has difficulty
> working independently, particularly in the test environment.

(Display Dep't Final Ladder Ranking; Barna Dep. p. 63-64; see also Barna

Dep. p. 30, 32, 54-58.) Burger disagrees with this assessment, and testified

that she possessed the skills listed and frequently worked independently.

(Burger Dep. p. 87-90.) Indeed, her 2010 Annual Appraisal categorized

Burger's Independent Work Ability as "Consistently Exceeds Expectations."

(Ex. P-125.) Barna testified that Burger's "performance was not as good as

other developers." (Burger Dep. p. 30.)

MSE retained 71 employees in the Display Department after the

reduction in force, all of whom were ranked higher than Burger on the

ladder ranking. (Display Dep't Final Ladder Ranking.) The remaining

employees ranged in age from 31 to 71 years old. (Gwyn Decl. ¶ 9.) At the

time of her layoff, Burger was working on a software development task that

was scheduled to be completed in February 2012. (Def. Answers to Burger's

Interrogs. #5.) Following her layoff, Glen Tarasov, age 37, completed the

task. (Id.; Barna Dep. p. 34.)

Of the retained employees, Burger identifies several who were

younger than she was, had less experience, and who were retained: David

McClintock, who was 39, Frederick Robinson, 34, Michael Bennett, 37,

Scott Shimp, 38, Ryne Wolfgang, 25, Jay Marshall, 26, Ryan Runquist, 27,

and Glen Tarasov, 37. (Burger's Answers to Interrogs. #10, 11; Burger Dep.
p. 92; Gwyn Decl. ¶ 11.) Of these eight employees, five (McClintock,
Robinson, Bennett, Wolfgang, and Tarasov) reported to different Section
Managers from Burger, depending on tasking. (Burger Dep. p. 101-04, 41;
Barna Dep. p. 21-22.) Therefore, these employees would not be similarly
situated to Burger.  Opsatnik v. Norfolk Southern Corp., 335 Fed. Appx.
220, 222-23 (3d Cir. 2009).

All of the employees identified by Burger were ranked higher than she
was because, in the judgment of Barna and the Section Managers, they had
stronger C++ programming skills. (Barna Dep. p. 54, 56-58.) However,
Runquist's 2011 Evaluation stated that "he needs to continue to focus on his
increasing his C++ programming skills." (Ex. P-129.) This casts some doubt
on MSE's legitimate, non-discriminatory reasons for selecting Burger for
termination.

MSE assumes, for purposes of this motion, that Burger can establish a
*prima facie* case of age discrimination. With MSE having provided a
legitimate, non-discriminatory reason for Burger's termination, the Court
turns to the issue of pretext. The Court has already determined that the
statistical evidence presented in this case, while supportive of an inference

of discrimination, cannot alone establish that age was a factor in any individual case so as to establish pretext.

Of course, Burger also was a part of the 2011 conversation with Reichl about office space being conducive to "younger" people's working environment. The discussion reviewed above was not necessarily indicative of age-related bias entering into the ladder rankings. Reichl suspected in Spring 2011, however, that a RIF was likely. (Reichl Dep. p. 26-27.)

Like Dallas, Burger argues that ladder rankings were rigged or manipulated to match desired terminations, transferability assessments were not made because Goehrig and Reichl were not familiar with her abilities, and MSE's stated justification for termination is not credible. Burger's position on the ladder ranking (and the position of the individual ranked below her, Annette Taylor) is the same on both versions of the ladder ranking. (Compare Ex. P-1 and P-41.) The Final Display Ladder Ranking varied from the November 2011 version with regard to the five lowest positions in the 72, 73 and 74 slots. (Id.) William Skorko, age 51, was moved from the sixty-eighth position on the ladder ranking to the seventy-fourth position because his position at the time was administrative in nature, and he had not demonstrated the skill sets necessary for moving into the future with MSE at the level of his co-workers. (Barna Decl. at ¶ 1.)

Further, after the initial rankings, it was determined that the number of managers at MSE would be reduced in the reduction in force. (Barna Decl. ¶ 2.) As a result, Kimble Watson, 69, and Gary Zimak, 52, who were the lowest-ranked managers in the Display Department, were moved down into the seventy-second and seventh-third positions on the ladder ranking. (Barna Decl. ¶ 2.) The individual who was moved from the seventy-third slot to a higher position in the final ladder ranking, Kimberly Turner – thus saving her from layoff – was 52 years old. (Compare Ex. P-1 and P-41; see Gwyn Decl. ¶ 1.) Glen Tarasov, 39, and Francis Smith, 42, were moved from the seventy-fourth and seventy-seventh slots to slightly higher positions on the final ladder ranking (and therefore retained). (Barna Dep. at 99:4-13; Barna Decl. ¶ 3.)

Overall, however, the Display ladder ranking from November 2011, one month prior to the RIF, consisting of only the bottom portion of the ranking (*i.e.* the individuals slated for RIF), identified nine individuals for termination, ranging in age from 24 to 56. Ex. P-, at 3; Goehrig Dep. p. 150-51. A month later, all five of the employees laid off from Display were over the age of 50. Ex. P-1 at 21. Two of those terminated employees, ages 52 and 69, were not on the earlier termination list. Compare Ex. P-1 at 21 (ranking Zimak 73 out of 76 and Watson 72 out of 76) with Ex. P-2 (Zimak and

42

Watson absent from the termination list). Three employees in their twenties on the November termination list all had a higher position in the ladder ranking by the time of the RIF. Compare Ex. P-2 at 21 (ranking Runquist, age 27, 69 out of 76; Labas, age 24, 70 out of 76; and Hancock, age 26, 71 out of 76) with Ex. P-1 (ranking Runquist 66 out of 76, Labas 67 out of 76, and Hancock 68 out of 76).

The Court finds that, under all of these circumstances, a jury could disbelieve MSE's explanation for its Final Display Ladder Ranking, and therefore denies MSE's motion for summary judgment as to Linda Burger.

**D. The Mission Assurance Group**

During the relevant time period, MSE maintained an Engineering Technology and Innovation ("ET&I") Department. (Velte Dep. p. 38-39.) The ET&I Department was separated into three groups – the Solutions Architecture Group, the Developmental Engineering Group, and the Mission Assurance ("MA") Group. (Id.) The Solutions Architecture Group was responsible for providing the technical roadmap for MSE's technical products and supporting business development activities, the Developmental Engineering Group was responsible for prototyping and developing next-generation capabilities, and the MA Group was responsible for performing integration tests and performance engineering to validate

the function and stability of the weapons software. (Velte Dep. p. 39; Beck Dep. p. 24; Zimmerman Dep. p. 14.)

Director Eric Velte led the ET&I Department and directly supervised the Solutions Architecture employees. (Velte Dep. p. 37-38.) Scott Hind was the Developmental Engineering Group Manager and Edward Beck was the MA Group Manager. (Velte Dep. p. 38; Beck Dep. p. 20.) Both Hind and Beck reported to Velte, who, in turn, reported to Vice President of Innovation and Technology Charles Zimmerman. (Velte Dep. p. 37, 38; Beck Dep. p. 21; Zimmerman Dep. p. 12, 17.)

In the MA Group, the Section Managers completed the performance appraisals for the employees who reported to them, and Beck reviewed the appraisals for form and content. (Beck Dep. p. 43-44.) The only performance appraisals Beck completed on his own were for his for direct reports -- the Section Managers. (Beck Dep. p. 42-43.) Velte reviewed and approved the appraisals for the MA Section Managers, but he had no involvement with the appraisals for the MA employees under the Section Managers. (Velte Decl. ¶ 1-2.)

Although MSE employees had received performance appraisals in mid-2011, they were also given end-of-year performance appraisals that year to align the MSE performance appraisal cycle with its parent

company's cycle. (Beck Dep. p. 188-89.) The majority of MA employees,
received an identical performance appraisal to the one they had received
earlier that year, indicating, "[t]he performance of this individual has
remained substantially unchanged," and stipulating that "their June 2011
performance ranking be extended to 31 December 2011." (Beck Dep. 189,
190-91.)

Beck drafted the ladder rankings for the MA Group considering value
to the ET&I Department, which he assessed based upon employees'
performance, and technical and tactical skills as compared to their peers.
(Beck Dep. p. 91, 99.) In completing the MA ladder rankings, Beck
considered feedback he had received from MSE's customer, Lockheed
Martin, as well as feedback he had received from the Section Managers.
(Beck Dep. p. 92, 93.) Velte drafted the ladder rankings for the Solutions
Architecture employees, and Hind drafted the ladder rankings for the
Developmental Engineering employees. (Velte Dep. p. 61.)

Beck and Hind provided the ladder rankings for their respective
groups to Velte, who then met with Beck and Hind to discuss them. (Velte
Dep. p. 69; Beck Dep. p. 103.) Following his meetings with Beck and Hind,
Velte merged the Solutions Architecture, Developmental Engineering, and
MA ladder rankings to create a consolidated ET&I ladder ranking, which he

provided to Zimmerman. (Velte Dep. p. 60-62.) Velte created the consolidated ET&I ladder ranking considering employees' value to the Company, based upon his personal knowledge of the employees, as well as information Beck and Hind had provided to him. (Velte Dep. p. 70-71.)

In creating the consolidated ET&I ladder ranking, the only change Velte recalls making to the order of the MA ladder rankings prepared by Beck involved moving one employee, Andrew Parsons, higher on the ranking. (Velte Dep. p. 84-86.) Velte moved Parsons to a higher position on the ladder ranking because Parsons had been serving as a cost account manager for the Solutions Architecture Group and Velte therefore considered him more valuable than Beck's ladder ranking would suggest. (Id.)  Zimmerman reviewed the ET&I ladder rankings, although he did not make any changes to the ranking of any of the employees within the MA Group. (Zimmerman Dep. p. 51.)

At the time of the January 2012 reduction in force, there were 74 employees in the ET&I Department. (Beck Dep. p. 146-47; ET&I Final Ladder Ranking.)

### 1. Alfred DiTullio [Motion at docket entry 42]

Alfred DiTullio was employed by MSE and/or its predecessor for more than 4 years; he was 53 years old on the date of his termination.[12] (DiTullio Dep. p. 211-12.) At the time of his termination, DiTullio was a Software Engineer, Senior Principal in the MA Department, engineering software.

DiTullio worked for CSC beginning in 2008, in the group that ultimately became the MA Group within the ET&I Department at MSE. (DiTullio Dep. p. 123, 212-13.) During the relevant time period, DiTullio reported to Section Manager David Frank. (DiTullio Dep. p. 140-41.) In the MA Group, DiTullio provided technical support for weapons operating systems. (DiTullio Dep. p. 134, 100-01; Beck Dep. p. 77-78.) DiTullio admitted that he was "not a qualified program manager" and that there were other individuals at MSE who had more extensive Java skills than he did. (DiTullio Dep. p. 108, 261, 177-78.)

---

[12] Prior to becoming a full-time CSC employee in 2008, DiTullio had worked for CSC as a consultant beginning in approximately 2006, reporting to Edward Beck, who was a Section Manager at CSC at the time. (DiTullio Dep. p. 83-84; Beck Dep. p. 19, 207.) Beck interviewed DiTullio in 2006 and was involved in the decision to bring DiTullio on as consultant, a position DiTullio held until approximately November 2007. (DiTullio Dep. p. 85, 90-92, 118; Beck Dep. p. 210.) Beck also recommended DiTullio's hire as a full-time employee when he was being considered for the position in 2008. (Beck Dep. p. 210-11.)

In his performance appraisal, DiTullio received an overall rating of "3" or "Meets Expectations." (DiTullio 2011 Performance Evaluation.) Frank completed the appraisal, and Beck approved it. (Beck Dep. p. 190.) Although DiTullio disagrees generally with the fact that MSE stipulated that his mid-2011 performance ranking would be extended until the end of the year, he signed his late 2011 performance appraisal, and testified that he does not consider the contents of the appraisal to be inaccurate and he "agree[s] with the review." (DiTullio Dep. p. 240.)

In the Final ET&I Ladder Ranking, DiTullio was ranked 72 out of 74.[13] (Final ET&I Ladder Ranking.) The justification given for DiTullio's selection for layoff was:

> Declining contract dollars in Operating Environment Support require MSE to reduce staff. The skills required in a future role with MSE are real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, and object-oriented software development experience. Mr. DiTullio does not possess these skills.

(Final ET&I Ladder Ranking.) Beck testified that although DiTullio was "a good coordinator in the lab," he "lacked a lot of the technical tooling," and was not capable of "debugging a . . . file to determine . . . root case issues."

---

[13] Neither Velte nor Zimmerman made any changes to the ladder ranking prepared by Beck that resulted in a change to DiTullio's position in the ladder. (Velte Dep. p. 84-86; Zimmerman Dep. p. 51.)

(Beck Dep. p. 78.) No one assumed DiTullio's duties following his layoff.

(MSE Answers to DiTullio's Interrogs. #5; Beck Dep. p. 84.)

Although DiTullio claimed in his discovery responses that six individuals were retained who were younger and less qualified or experienced than he was – Carl Wertz, age 31, Eric Landrieu, 42, Steve Bauer, 39, Tony Ricco, 46, Tyler Myers, 35, and William Jenkins (DiTullio Answers to Interrogs. #11; Gwyn Decl.) – during his deposition, he testified that he actually "do[es]n't know" whether he believes that any other MSE employees should have been laid off instead of him:

> Q. Do you believe that other people at MSE should have been laid off instead of you?
> A. I really – I – I wouldn't wish that on anyone. Okay? So no. I don't know. I really don't know. It depended on what criteria was to be used. Sometimes you have to make cold, hard decisions . . . .

(DiTullio Dep. p. 275.)

Of the individuals DiTullio identifies, only two – Bauer and Jenkins – received a performance rating of "3," or "Meets Expectations," like DiTullio, on their 2011 performance appraisals. (Beck Decl. ¶ 2.) Wertz, Landrieu, and Ricco all received performance ratings of "2," or "Occasionally Exceeds

Expectations," and Myers received a performance rating of "1," or "Consistently Exceeds Expectations" in 2011. (Beck Decl. ¶ 3-4.)[14]

Beck testified that he ranked Wertz over DiTullio because he had been Lockheed Martin's "lead network engineer" and MSE was "lucky to have picked up [Wertz] on our team to kind of help grow our performance engineering activities specifically related to [Wertz]'s expertise with networking." (Beck Dep. p. 126-27.) Beck explained that Wertz "was the network's subject matter expert at Lockheed Martin, and his skills were well above [DiTullio]'s in terms of being able to triage network[-]type issues." (Beck Dep. p. 126.) Beck ranked Landrieu above DiTullio because Landrieu's "software skills, his operating system knowledge, his knowledge of open source software, his ability to create tools, utilities, diagnostic utilities for utilization in the . . . lab environment is just far and above [DiTullio]'s." (Beck Dep. p. 127-28.)

Beck ranked Bauer above DiTullio because Bauer "had a lot of tools and utilities that we could use . . . [a]nd specifically he had a display background . . . so he had specific domain experience with being able to

---

[14] Each of the six comparators identified by DiTullio received performance appraisals in late 2011, indicating that "[t]he performance of this individual has remained substantially unchanged," and stipulating that "their June 2011 performance ranking be extended to 31 December 2011." (Beck Decl. ¶ 5.)

troubleshoot and triage display issues." (Beck Dep. p. 128.) Similar to Bauer, Beck testified that he ranked Jenkins above DiTullio on the ladder ranking because "he had software skills specific to the display group . . . [s]o [Jenkins] had that uniqueness with respect to being able to triage specific display areas." (Beck Dep. p. 130.) He explained that Jenkins "had broad software background for tools and utilities that [DiTullio] didn't have." (Beck Dep. p. 130.)

Beck ranked Ricco above DiTullio because he is "one of our [subject matter experts] over all the subject matter experts" and "has a broad set of very deep skills, both technically and tactically." (Beck Dep. p. 128-29.) Beck testified that Ricco was "far and above [DiTullio] for sure [and] is definitely one of the go to people within the department." (Beck Dep. p. 129.)

Myers was ranked above DiTullio on Beck's ladder ranking because he "is very placeable anywhere" and "has tremendous software skills." (Beck Dep. p. 129.) Beck explained that Myers was "one of the . . . senior developers for our product that we called Insight, which . . . was our primary tool that they used in one of the baselines to do validation verification of the operating environment," and that he "had a lot of great software and infrastructure skills in addition to the management role that

we put him in . . . ." (Beck Dep. p. 129-30.) Myers was a Section Manager in the MA Group; in fact, DiTullio reported to Myers at one point during his employment with MSE. (DiTullio Dep. p. 164, 295.) DiTullio never held a management position at CSC or MSE. (DiTullio Dep. p. 297.)

DiTullio admits that he does not know whether Wertz, Landrieu, or Jenkins had skill sets or experience that were different from his. (DiTullio Dep. p. 293-94.) DiTullio also admits that Bauer held a top secret clearance that he did not have. (DiTullio Dep. p. 294.) DiTullio is aware that Ricco worked on "one of the applications group[s]" but "do[es]n't recall the details." (DiTullio Dep. p. 295.)

Nonetheless, MSE assumes, for purposes of this Motion, that DiTullio is able to establish a prima facie case. As such, the Court turns to whether he has sufficiently shown that MSE's legitimate, non-discriminatory reasons for his termination are merely pretext for age discrimination.

When asked why he believes MSE discriminated against him based upon his age, DiTullio testified he believes that "because of patterns and trends of all the people that had been laid off" and that he "can see very clearly that there was a trend towards age." (DiTullio Dep. p. 283-86.) He also believes his selection for layoff was motivated by his age because he disagrees with the justification MSE provided for his layoff in the ET&I

final ladder ranking (that he did not possess the skills required in a future role with MSE), and because MSE "just rubber stamped" his early 2011 performance appraisal in late 2011 without providing him with a new performance appraisal. (DiTullio Dep. p. 289, 250-51.)

In contrast for the stated reasons for his layoff,[15] DiTullio's 2011 Performance Evaluation signed off on by Beck discussed his "proficiency with various diagnostic tools for data analysis, keen understanding of operating systems on multiple baselines, and overall OE knowledge." (Ex. P-113; Beck Dep. p. 190-91.) Indeed, Beck testified that DiTullio "somewhat" had the ability to do "real-time troubleshooting with open architecture environments" and "diagnostics with open architecture operating environments." (Beck Dep. p. 53-54, 56-57.) DiTullio argues that this shows his placement on the ladder ranking was not based on his 2011 Performance Appraisal. However, the record is clear that the ladder ranking was based on comparisons of the various levels of skills possessed by the employees. DiTullio's argument disagrees with MSE's assessment of his skills, which was made in comparison to his co-workers; this does not establish pretext. Having reviewed the record, the Court finds insufficient

---

[15] Lack of "real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, and object-oriented software development experience."

contradiction in the justifications put forth by MSE for DiTullio's termination to establish pretext. Summary judgment is granted in favor of MSE on DiTullio's claims.

### 2. Anthony Marino [Motion at docket entry 47]

Anthony Marino was employed by MSE and/or its predecessor for more than 16 years; he was 78 years old on the date of his termination. (Marino Dep. p. 139-140.) At the time of his termination, Marino was a Senior Software Engineer in the MA Department, where he ran tests on software and suggested improvements for the system. (Marino Dep. p. 170.)

Marino began working for CSC in October 1996 and, in August 1997 he began working full time on the AEGIS project. (Marino Dep. p. 44, 52.) He initially worked in a testing group assigned to the Weapons Control Systems ("WCS") Department and subsequently transferred into WCS in approximately 2000. (Marino Dep. p. 54, 70-71.) During his time in WCS, Marino conducted systems testing and reported on the results. (Marino Dep. p. 74.) Marino reported to Albert John Ellor. (Marino Dep. p. 72.)

In April 2011, Marino was involuntarily transferred from WCS to the MA Group within the ET&I Department. (Marino Dep. p. 89-90.) His transfer resulted from the fact that there was less funding for and work in the WCS Department than for the MA Group. (Marino Dep. p. 90-91.) In

the MA Group, Marino continued to work in testing and reported to Section Manager David Frank. (Marino Dep. p. 93-94, 95.)

In the final ET&I ladder ranking, Marino was ranked 73 out of 74. (Final ET&I Ladder Ranking.) The justification given for Marino's selection for layoff was that "[t]he skills required in a future role with MSE are real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, and object-oriented software development experience," and that "Mr. Marino does not possess these skills." (Final ET&I Ladder Ranking.) Beck described Marino's performance in the MA Group as "under the radar" because he did not receive good or bad feedback about his work from MSE's customer. (Beck Dep. p. 81-82.) Marino "just kind of blended into the background . . . Tony never approached [Beck] to want to do anything different, anything new to get involved in any new activities like the other employees did." (Beck Dep. p. 133.) Due to budget cuts and reduced needs, there was not sufficient testing work to replace Marino following the reduction in force. (Def. Answers to Beck's Interrogs. #5.)

Marino identified one employee in the MA Group, Penny Litterio, age 50, as being "younger and less qualified or experienced than he was." (Marino Dep. p. 178.) In comparing Litterio to himself, Marino contends

that Litterio "didn't have the experience [he] had." (Marino Dep. p. 178.)

Marino admits was not adept in the Java or C++ programming languages.

(Marino Dep. p. 84.) He was also not familiar with open architecture

operating environments, nor did he have skills in object oriented

programming. (Marino Dep. p. 109.) In contrast, Litterio, had skills in real-

time trouble-shooting with open architecture operation environments,

system performance tuning, and object oriented software development.

(Beck Dep. p. 52-53; Marino Dep. p. 84, 109.)

When asked why he ranked Litterio higher than Marino on the ladder

ranking, Beck testified:

> Penny had a background in multiple product areas, command and
> control and weapons. Most recently before she moved into our
> group it was weapons. The thing about Penny was she came to me
> numerous times wanting to get involved in the COTS baseline
> technology. She wanted badly to get involved in the ACB12
> arena. The customer loved her work that she was doing.
>
> * * *
>
> It wasn't any one specific project. . . It was whatever she was
> working at the time, she was doing a very good job. And she
> brought a stronger background, a broader background, and a
> stronger desire to want to get involved in other COTS refresh
> opportunities.

(Beck Dep. p. 120-32.)

MSE assumes, for purposes of this Motion, that Marino is able to

establish a *prima facie* case. The Court thus analyzes whether he is also

able to show that MSE's reasons for his termination were pretextual.

When asked why he believes MSE discriminated against him based upon his age, Marino identified three purported reasons: (1) the "large number of people with advanced ages that were laid off," (2) MSE laid off Marino while retaining Litterio, and (3) his belief that "that's what a lot of companies do, you know, get rid of the dead wood is what some people say," because "of the older workers making too much money." (Marino Dep. p. 220-22.)

Again, an employee cannot show pretext by using his disagreement with the employer's assessment of his skills in comparison to co-workers, essentially asking the Court to second-guess performance-based employment decisions. Having considered the entirety of the record, the Court finds that Marino has not pointed to sufficient evidence to show that a reasonable jury could either disbelieve MSE's articulated legitimate reasons for his layoff or believe that an invidious discriminatory reason was more likely than not the real reason for MSE's action. MSE's motion for summary judgment will be granted as to Marino's claims.

### 3. Louis Natale [Motion at docket entry 46]

Louis Natale was employed by MSE and/or its predecessor for more than 26 years; he was 63 years old on the date of his termination. (Natale Dep. p. 133.) At the time of his termination, Natale was a Senior Computer

Scientist in the MA Department and a tester for the AEGIS system. (Natale Dep. p. 50-53.)

Natale began working for CSC in 1986, and, in approximately 2004, moved to the group that ultimately became the MA Group within the ET&I Department at MSE beginning in approximately 2004. (Natale Dep. p. 47.) During the relevant time period, Natale reported to Section Manager David Frank. (Natale Dep. p. 74.) In the MA Group, Natale was a "tester." (Natale Dep. p. 49; Beck Dep. p. 64.) In that position, Natale tested the systems created by the software developers and reported the results of the testing and any problems discovered to the developers. (Natale Dep. p. 50-53.)

In his late 2011 performance appraisal, Natale received an overall rating of "3" or "Meets Expectations." (Natale Dep. p. 188; Natale 2011 Performance Eval.) Frank completed the appraisal, and Beck approved it. (Beck Dep. p. 189-90.) Natale signed the appraisal. (Natale 2011 Performance Eval.)

In the final ET&I ladder ranking, Natale was ranked 71 out of 74. (Final ET&I Ladder Ranking.) The justification given for Natale's selection for layoff was that "[t]he skills required in a future role with MSE are real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, and object-oriented software

development experience," and that "Mr. Natale does not possess these skills." (Final ET&I Ladder Ranking.) Natale admits that he was not a developer, nor did he have object-oriented software, diagnostics, Java or C++ skills. (Natale Dep. p. 53-54, 67, 69.) When asked to define "open architecture operating environments," Natale responded, "I don't profess to know enough about it to be able to give you a real good answer." (Natale Dep. p. 68.)

Beck testified that while Natale could test a program to determine whether it was working properly, he was not skilled in root cause analysis (*i.e.*, diagnosing the cause of problems). (Beck Dep. p. 66-68, 70.) He also explained that Natale was incapable of working on certain baselines because he did not have the requisite skill sets. (Beck Dep. p. 65.) Due to budget cuts and reduced needs, there was not sufficient testing work to replace Natale following the reduction in force. (Def. Answers to Natale's Interrogs. #5; Beck Dep. p. 82.)

Although Natale contends three individuals were retained who were younger and less qualified or experienced than he was – William Dillmore, age 49, Penny Litterio, 50, and Sharon Morang, 29 – when asked who on the ladder ranking was less valuable than he was to the MA Group, Natale responded, "I can't answer that question." (Natale Answers to Interrogs.

#10, 11; Natale Dep. p. 196-97.) Natale admits that Litterio had software development skills, which he did not have. (Natale Dep. p. 53-54, 97.) Natale also admits that he does not know whether Dillmore, Litterio or Morang had "real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, or object-oriented software development experience," except that he believes Litterio had object oriented software development experience. (Natale Dep. p. 204-05.) In late 2011, Morang received a performance rating of "2," or "Occasionally Exceeds Expectations" on her performance appraisal, and Dillmore received a performance rating of "1," or "Consistently Exceeds Expectations." (Beck Decl. ¶ 2, 3.)

Beck ranked Dillmore over Natale on the ladder ranking because he rated Dillmore's technical and tactical skills higher than Natale's and because Dillmore "had more command of activities with respect to triaging, troubleshooting, working, coordinating issues." (Beck Dep. p. 133.) He ranked Litterio above Natale because she had a "command of the multiple tactical environments, the product environments." (Beck Dep. p. 133-34.) Beck ranked Morang higher than Natale because she had experience working on some of the baselines that Natale did not. (Beck Dep. p. 64-65, 134.)

MSE assumes, for purposes of this Motion, that Natale can establish a *prima facie* case. The Court therefore evaluates whether MSE's legitimate reasons for his termination could be a pretext for age discrimination.

When asked why he believes MSE discriminated against him based upon his age, Natale testified that based upon his own observation, "[i]t was very obvious that everybody [who was selected for layoff] was close to - a number of them - older than myself even past retirement age, and the majority in their mid to late 50s approaching retirement age within a few years, it became rather obvious to me that [age] was the criteria used." (Natale Dep. p. 211.) He also believes his selection for layoff was motivated by his age because he disagrees with the justification MSE provided for his layoff in the ET&I final ladder ranking in that the skills listed "don't have anything to do with testing." (Natale Dep. p. 212.)

The Court finds Natale's disagreement with MSE's decision insufficient to create a genuine issue of material fact. MSE's business decisions regarding which Departments would be affected by overall declining contract dollars, whether positions eliminated by the RIF would later be back-filled, and whether enumerated tasks should or should not have been considered as part of the decision-making are beyond this Court's scope of review. Natale has not pointed to sufficient evidence to

show that a reasonable jury could either disbelieve MSE's articulated legitimate reasons for his layoff or believe that an invidious discriminatory reason was more likely than not the real reason for MSE's action. MSE's motion for summary judgment will be granted as to Natale's claims.

### 4. Stephen Perry [Motion at docket entry 53]

Stephen Perry was employed by MSE and/or its predecessor for one year; he was 46 years old at the time of his termination. (Perry Dep. p. 106-07.) At the time of his termination, Perry was a Section Manager[16] in the MA Department responsible for the AEGIS modernization group. (Perry Dep. p. 125-27; Beck Dep. p. 85, 152.) He was promoted to this position in March 2011, after just a few months with the company.

Perry began working in the MA Group in December 2010 following an interview with Beck, who recommended hiring him. (Perry Dep. p. 65-67; Beck Dep. p. 212.) Perry moved to different areas of responsibility as a Section Manager during his employment, ultimately overseeing 16 employees involved in integration for AEGIS modernization. (Perry Dep. p. 69-70, 86, 125-27; Beck Dep. p. 29.) Perry reported directly to Beck throughout his time at MSE. (Beck Dep. p. 43-44.)

---

[16] Perry described his title as "principal software engineering leader," although within MSE's structure it was that of Section Manager. (Perry Dep. p. 66; Beck Dep. p. 29.)

In the MA Group, the Section Managers, including Perry, completed performance appraisals for the employees who reported to them, and Beck reviewed the appraisals for form and content. (Beck Dep. p. 43-44.) The only performance appraisals Beck completed on his own were for his for direct reports (the Section Managers, including Perry). (Beck Dep. p. 42-43.) Velte reviewed and approved the appraisals for the MA Section Managers, but he had no involvement with the appraisals for the MA employees under the Section Managers. (Velte Decl. ¶ 1-2.)

Perry received his first performance appraisal for the period from his start date through March 31, 2011. (Perry Dep. p. 108.) In the mid-year appraisal, Perry received an overall rating of "3 – Meets Expectations." (Perry Dep. p. 113; Perry mid-2011 Performance Appraisal.) In late-2011, MSE gave end-of-year performance appraisals to its employees to align its review cycle with that of its parent company. (Beck Dep. p. 188-89; Perry Dep. p. 116.) At the end-of-year appraisal, Perry received a higher overall rating of "2 – Occasionally Exceeds Expectations." (Perry Dep. p. 87, 108, 122; Perry year-end 2011 Performance Appraisal.) The increased rating that Beck gave to Perry (with Velte's approval) resulted from Perry's work on the different management tasks that he had been assigned. (Beck Dep. p. 193-94.) Beck wrote, "Mr. Perry is truly leading the way for the success of our

Mission Assurance organization in future Surface Navy and other business domains." (Beck Dep. p. 214.) Perry believed that both performance appraisals were accurate and appropriate. (Perry Dep. p. 112-13, 122-23.)

In his initial ranking of the MA employees, Beck ranked Perry 30 out of 75, ahead of other Section Managers Tooley, Allen, and Parsons based on his management skills. (Beck Dep. p. 158, 162.) At the time that Beck prepared his initial ranking of the MA employees, he did not know that the reduction in force would include management levels. (Beck Dep. p. 162, 163.) In subsequent discussions regarding the consolidated ET&I ladder ranking, however, Beck and Velte decided that they should consider not just the management abilities of the Section Managers, but also their technical skills. (Beck Dep. p. 109-10, 161-62.) They made this decision allegedly because, if the department ultimately had fewer managers, the way in which the department's work was evolving would require the remaining employees to have technical skills to handle the work. (Beck Dep. p. 110, 168-69.) Thus, in reviewing the ranking, Beck and Perry decided "to look at the ranking with respect to if [Section Managers] are no longer a manager, what value do they bring to the department." (Beck Dep. p. 159.)

When considering the technical skills of the Section Managers to determine their value, Perry's ranking dropped to 55 of 75. (Beck Dep. p.

159-60, 165-66; Beck Decl. ¶ 4.) Beck's reasoning is that Perry did not have

tactical or technical skills related to AEGIS. (Beck Dep. p. 85, 160.) Rather,

throughout his employment, Perry held a Section Manager position in

which he oversaw a group of employees. (Perry Dep. p. 66, 68; Beck Dep. p.

29, 85.)  Ultimately, Perry was ranked 55 of 74 employees in the final ET&I

ranking, and he was the lowest-ranked Section Manager. (Beck Dep. p.

158-59, 160; Final ET&I Ladder Ranking.) In the reduction in force, ten

ET&I employees were selected for layoff in the Department, including one

Section Manager position. (Beck Decl. ¶ 2; Final ET&I Ladder Ranking.)

The justification given for Perry's selection for layoff was as follows:

> Declining contract dollars require MSE to reduce staff.
> This reduction requires a subsequent reduction in the
> number of management staff. The transition to a
> technical role requires a shift in skill set, from
> management to one including real-time troubleshooting
> and diagnostics within open architecture operating
> environments, system performance tuning, and [object
> oriented] software development skills that Mr. Perry does
> not possess.

(Final ET&I Ladder Ranking.) Following Perry's layoff, Mark Miller

assumed Perry's former duties. (Def. Answers to Perry's Interrogs. #5.)

Miller is more than two months older than Perry. (Gwyn Decl. ¶ 8.)

Perry identified three retained individuals who, he contends, were

younger and less qualified or experienced than he was: Miller, age 46,

Tyler Myers, 35, and Kevin Tooley, 36. (Perry's Answers to Interrogs. #11.) Miller, as noted above, is actually older than Perry. Further, Beck described Miller as better than Perry because Miller would have been underutilized in a role as just a software engineer or as just a manager. (Beck Dep. p. 170.) Beck views Miller as one of the best technologists at MSE and one of the "most respected engineers" by MSE's customer. (Beck Dep. p. 170.) Beck ranked Myers higher than Perry on the final ladder ranking because he had strong technical skills that allowed him to be placed anywhere within the MA Group, in contrast with Perry, who did not have technical skills related to AEGIS. (Beck Decl. ¶ 4.) Beck ranked Tooley higher than Perry because, unlike Perry, Tooley had the skills to be placed in a technical role. (Beck Dep. p. 165-66.) Following the reduction in force, Tooley moved from a Section Manager role to an integration role (a technical position). (Beck Dep. p. 31-32.) Miller, Myers, and Tooley all worked in technical roles at MSE before becoming Section Managers. (Beck Decl. ¶ 3.)

MSE assumes, for purposes of this Motion, that Perry can establish a *prima facie* case of discrimination. The Court now looks to the pretext arguments. When asked why he believes MSE discriminated against him based upon his age, Perry testified that when he went to information

sessions held for employees by human resources following the reduction in force, the other employees in the room appeared to be older than he was. (Perry Dep. p. 166-68.) Perry also cited the fact that he believed Tooley, a younger employee, replaced him. (Perry Dep. p. 156.)

In addition to these contentions, Perry also testified that he believes MSE "senior management," which he identifies as "the president of the company and his direct reports," rather than Beck and Velte, made the termination decisions. (Perry Dep. p. 166-68.) Perry premises this belief on two statements at managers' meetings. (Perry Dep. p. 168-70.) The first, at his first managers' meeting, was a portion of a conversation he overheard between Zimmerman and other employees in which Zimmerman purportedly said "how can we, you know, best remove the dead wood that's here within these programs." (Perry Dep. p. 75-76.) The second was a comment that Perry claims to have heard "at almost every one" of the monthly managers' meetings he attended. (Perry Dep. p. 171.) Initially, he described it as "whispered conversations" between senior managers and directors, in which these individuals stated "You know, about, oh, we can move, you know, people who were closer to retirement age over to the older baselines,[17] so when the older baselines

_____

[17] In lay terms, Plaintiff Harvey Sklar described a baseline as "basically the major clients that [employees] worked for." (Sklar Dep. p. 38.)

phase out, they can retire and, you know we kill two birds with one stone." (Perry Dep. p. 169.) Initially, Perry testified that he did not know the names of the managers making these statements. (Perry Dep. p. 170-71.) Later in his deposition, Perry attributed this "whispered conversation" to Beck, although he could not identify the specific words Beck used. (Perry Dep. p. 173-80.) According to Perry, Beck made a statement regarding moving employees nearing retirement age to older baselines, although he did not identify any specific employees in making the statement. (Perry Dep. p. 179-80.)

Aside from these reasons, the Court finds that when Zimmerman, or his Department, substituted Perry for Andrew Parsons on RIF list, (Zimmerman Dep. p. 80-81; Knowles Dep. p. 177-18; Ryan Dep. p. 117-18), MSE created the sort of weakness, implausibility, inconsistency, incoherency, or contradiction regarding MSE's reliance on its ladder rankings that must allow Perry to survive summary judgment.

There is a version of the ladder ranking that appears to indicate that Perry was put on the termination list at a time he was not the lowest ranked manager. (Knowles Dep. p. 172-79, Ex. P-3 at 3-5 (showing Perry on the RIF list), 37-38 (showing Perry ranked 30 out of 75, above Tooley, Allen, and Parsons, ranked 60, all three of whom were Section Managers at the

time), Ex. P-7 at Slide 7 (pre-RIF organizational chart)). Regardless, it is clear that at some point, MSE management altered the ladder ranking to make Perry the lowest ranked manager, subject to the RIF. (Ex. P-1 at 22-24.) Exhibit P-47 shows that Perry was put on the termination list as a "substitute" for Parsons. (Ryan Dep. p. 117-118, Ex. P-47.) At the time of the RIF, Perry and Parsons were 46 and 41 years of age, respectively. Contrary to a stated reason for the switch, there is testimony that Parsons also did not have "technical skills." (Beck Dep. 54-55, 58, 60-61, 62-63.) Taken along with the totality of the record, these circumstances are sufficient to show pretext regarding Perry's layoff. MSE's motion for summary judgment as to Perry's claims will be denied.

### 5. Daniel Ruvin [Motion at docket entry 44]

Daniel Ruvin was employed by MSE and/or its predecessor for over 27 years; he was 65 years old at the time of his termination. (Ruvin Dep. p. 91.) At the time of his termination, Ruvin was an Integration Leader in the Mission Assurance Department. (Ruvin Dep. p. 35-36; Beck Dep. p. 152.)

Ruvin worked in the MA Group since approximately 1982. (Ruvin Dep. p. 34, 37.) At the time of his layoff, Ruvin worked as a "systems integrator." (Ruvin Dep. p. 35-36.) In that role, Ruvin coordinated the systems testers in the MA Group to ensure the interfaces were tested

properly. (Ruvin Dep. p. 123.) During the relevant time period, Ruvin reported to Section Manager David Frank. (Ruvin Dep. p. 38.)

In his performance appraisal, Ruvin received an overall rating of "3" or "Meets Expectations." (Ruvin 2011 Performance Appraisal.) Frank completed the appraisal, and Beck approved it. (Beck Dep. p. 191-92.) Although Ruvin disagrees generally with the fact that MSE stipulated that his mid-2011 performance ranking would be extended until the end of the year, he does not disagree with his performance rating and "do[es] not think [the appraisal] was unfair." (Ruvin Dep. p. 102-03, 109-10.)

In the final ET&I Department ladder ranking, Ruvin was ranked 69 out of 74. (Final ET&I Ladder Ranking.) The justification given for Ruvin's selection for layoff was that "[t]he skills required in a future role with MSE are real-time troubleshooting and diagnostics with open architecture operating environments, system performance tuning, and object-oriented software development experience," and that "Mr. Ruvin does not possess these skills." (Final ET&I Ladder Ranking.) Beck testified that while Ruvin was "a good coordinator in the lab," he "lack[ed] . . . root cause analysis skills" and his technical skills were not as advanced as the other integrators in the MA Group. (Beck Dep. p. 75-

77.) No one assumed Ruvin's duties following his layoff. (Def. Answers to Ruvin's Interrogs. #5.)

Ruvin identified seven retained individuals who were younger and less qualified or less experienced than he was – Nick DeStephano,[18] age 58, Velia Nicolai, 50, Barbara Stock, 53, William Dillmore, 49, Benjamin Moore, 50, Phillip Cornacchione, 54, and David Frank, 53. (Ruvin's Answers to Interrogs. #11; Ruvin Dep. p. 133-35, 148-50.) Nick DeStephano worked in the Radar Department, and was therefore not ranked by Beck.

Beck ranked Nicolai above Ruvin on the ladder ranking "partly" because of "the initiative she showed with helping to configure the things for the labs with some of the folks at Lockheed." (Beck Dep. p. 134.) Beck explained that individuals at Lockheed Martin thanked Beck for Nicolai's work on a special project, which helped MSE to obtain a contract that it still has today because of Nicolai's work. (Beck Dep. p. 124-25.) Beck went on to explain:

> [Nicolai's] involvement with the customer was that much higher. Just more of a command, not just a coordinator in the lab, but actually . . . getting involved, helping to reconfigure, helping to do setup, triage, troubleshooting. Dan [Ruvin] wasn't much of that. Dan was a coordinator. He did good coordination

---

[18] Ruvin believes DeStephano was earning a higher salary than he was at the time of the reduction in force, and therefore thinks MSE should have selected DeStephano for layoff over him.

from the integration side, but he didn't do much above and beyond that.

(Beck Dep. p. 134-35.) Although Beck testified that he did not recall receiving feedback from Lockheed Martin mentioning Ruvin, (Beck Dep. p. 180), Ruvin's final performance evaluation, drafted by Frank and signed off on by Beck, stated that Ruvin's "contribution . . . did not go unnoticed by the customer as Lockheed Martin applauded his efforts." (Beck Dep. p. 191-92.)

Beck ranked Stock above Ruvin on the ladder ranking because he "thought she had a better command of being able to troubleshoot and triage issues with respect to product area activities." (Beck Dep. p. 136.) She also "had some software background with display." (Beck Dep. p. 136.)

Similarly, Dillmore was ranked higher than Ruvin on the ladder ranking because "he had a better command of activities with respect to triaging, troubleshooting and coordinating issues" and Cornacchione was ranked higher than Ruvin because "he was more skilled at diagnosing and triaging issues than Ruvin." (Beck Decl. ¶ 7, 9.)[19] Moore was ranked

---

[19] Cornacchione ranked approximately 35 slots higher than Ruvin on the MA Group ladder ranking Beck submitted on Velte. (Beck Decl. ¶ 6.) Due to a clerical error, Cornacchione was not included on the final ET&I ladder ranking. (Beck Decl. ¶ 8.)

above Ruvin on Beck's ladder ranking because he was a system engineer and "had a firmer grasp . . . on the tactical domain probably than what [Ruvin] had." (Beck Dep. p. 136.) Beck ranked Frank above Ruvin because he had a "broad tactical background" and a "deeper technical background for sure, . . . more than just a coordinator in the lab statusing issues, but actually doing that next level of troubleshooting, triaging, and then the management aspect thrown on top of that." (Beck Dep. p. 135.) Frank was a Section Manager in the MA Group; in fact, Ruvin reported to him. (Ruvin Dep. p. 238.)

MSE assumes, for purposes of this Motion, that Ruvin can establish a *prima facie* case, so the Court turns to the pretext analysis. When asked why he believes MSE discriminated against him based upon his age, Ruvin testified that, based upon his observation, the layoff "disproportionately" affected "older people." (Ruvin Dep. p. 161.) He also testified that he believes his age motivated his selection for layoff because he disagrees with the justification MSE provided for his layoff in the ET&I final ladder ranking (that he did not possess the skills required in a future role with MSE) and because MSE reaffirmed his early 2011 performance appraisal in late 2011 rather than providing him with a new appraisal.  (Ruvin Dep. p. 109-10, 145, 157.)

Additionally, Ruvin testified that in 2010, he had a discussion with his then-manager, Mark Miller, regarding the fact that Ruvin did not receive a job he had requested. (Ruvin Dep. p. 130-31.) During the conversation, Miller allegedly told Ruvin that he "thought [Ruvin] was going to retire at 65."[20] (Ruvin Dep. p. 130-31.) This comment was temporally remote from the layoff process. Lastly, Ruvin claims that at the meeting at which he was advised of his layoff, Velte told him he "wasn't keeping up."[21] (Ruvin Dep. p. 160.) This comment, like "dead wood," does not necessarily evince age-based bias. See also Watson v. Premier Pork, LLC, Civ. A. No. 04-4997, 2005 WL 1863193 (E.D. Pa. Aug. 2, 2005) (holding that remarks that the plaintiff should be fired "because he 'can't keep up' on certain job assignments" "failed to advance his age discrimination claim").

Of the individuals in the MA Department whom Ruvin claims should have been laid off instead of him, only one – Moore, age 50 – received a performance rating of "3," or "Meets Expectations," like Ruvin, in late 2011. (Beck Decl. ¶ 2.) Frank, Stock, Nicolai and Cornacchione all received

---

[20] Miller had no involvement in Ruvin's 2011 performance appraisals or Ruvin's location on the 2011 ladder ranking. (Beck Decl. ¶ 11.)

[21] According to Ruvin, Beck, who ranked Ruvin and who was also at his termination meeting, did not say anything during the meeting. (Ruvin Dep. p. 160.)

performance ratings of "2," or "Occasionally Exceeds Expectations," in late 2011. (Beck Decl. ¶ 3.) Dillmore received a performance rating of "1" or "Consistently Exceeds Expectations." (Beck Decl. ¶ 4.)

Ruvin's own disagreement with MSE's assessment does not serve to rebut the legitimate reasons articulated by management. See Sarmiento v. Montclair State Univ., 513 F. Supp. 2d 72, 89 (D.N.J. 2007) (holding that a plaintiff's disagreement with assessment of candidates' qualifications in failure to hire case could not establish pretext). His arguments do not rise to the level of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that would be sufficient to demonstrate pretext. Accordingly, summary judgment will be granted in favor of MSE with regard to Ruvin's claims.

## E. The Process Engineering Department

During the relevant time period, MSE maintained a Process Engineering Department that was responsible for writing and improving procedures for the weapons systems used by the United States Government to ensure those systems were keeping up with advancements in technology. (McGarry Dep. p. 13.) The Department was also responsible for collecting data, conducting modeling, and making predictions regarding weapons

systems performance, as well as tracking the performance of those systems. (McGarry Dep. p. 13-14.) From approximately 2003 until sometime after January 2012, Jeffrey McGarry was Department Manager for the Process Engineering Department, and supervised all the employees in the Department.  (McGarry Dep. p. 10-11, 12, 14.)  McGarry reported to then-Delivery Assurance Director Tony Palazzo. (McGarry Dep. p. 12; Palazzo Dep. p. 13, 15-16.) Palazzo, in turn, reported to Senior Director George Reichl. (Palazzo Dep. p. 13-14.)

McGarry prepared the ladder rankings for the Process Engineering Department considering value to the Department, which he assessed based upon skill sets, and quality and quantity of output. (McGarry Dep. p. 28.) He did not consult anyone in drafting the ladder rankings. (Id.) After completing the rankings, McGarry sent them to Palazzo, who reviewed them but did not make any changes.  (Palazzo Dep. p. 36, 54-55.) Reichl also reviewed the ladder rankings, although he did not make any changes to them. (Reichl Dep. p. 33-34; Palazzo Dep. p. 29.) Ultimately, McGarry learned from Palazzo that one employee in the Process Engineering Department would be laid off in the reduction in force.

**Albert John Ellor** [Motion at docket entry 41]

Albert John Ellor was employed by MSE and/or its predecessor for more than 19 years; he was 68 years old on the date of his termination. (Ellor Dep. p. 116.) At that time, Ellor was an Engineering Manager in the Process Engineering Department.[22]

In approximately June 2011, Ellor was involuntarily transferred out of MSE's Weapons Control Systems ("WCS") Department, where he had been employed as a Section Manager for approximately ten years, to a non-management position in the Process Engineering Department. (Ellor Dep. p. 19-20, 82-83; Nale Dep. p. 34, 37.) Ellor's transfer to the Process Engineering Department was not disciplinary in nature but allegedly resulted from insufficient funding in the WCS Department to support his position. (Palazzo Dep. p. 57-58; Nale Dep. p. 34; McGarry Dep. p. 17.) To prevent Ellor from being terminated at that time, MSE created a position for him within the Process Engineering Department. (Id.) Other employees were also transferred out of the WCS Department during the same time period for budgetary reasons. (Nale Dep. p. 34.) Ellor's salary was not reduced as a result of the transfer. (Ellor Dep. p. 88.)

---

[22]Although Ellor's title in the Process Engineering Department was "Engineering Manager," he did not actually have any managerial duties during his tenure in the Process Engineering Department. (Ellor Dep. p. 161.)

In the Section Manager role, Ellor reported to Terrell "Scot" Nale, the manager of WCS, who in turn reported to Director William Goehrig. (Ellor Dep. p. 84, 115.) Ellor was the oldest Section Manager in WCS by a margin of eighteen years and the only Section Manager transferred out of the department. (Nale Dep. p. 34-35; Ex. P-1 at 36-37.) After his transfer, his duties were assumed by someone substantially younger. (Nale Dep. p. 37.)

In the Process Engineering Department, Ellor made typographical and other edits to the processes that had been drafted by the other employees in the Department and maintained a spreadsheet to track the progress of Computer Program Change Requests ("CPCRs"). (Ellor Dep. p. 106-11.) Ellor testified that none of the other employees in the Process Engineering Department did the same tasks as he did, and he could not describe the responsibilities of the other employees in the Department. (Ellor Dep. p. 113-14.) Ellor reported directly to McGarry. (McGarry Dep. p. 14; Ellor Dep. p. 82-83, 112-13.)

At the time of the January 2012 reduction in force, there were four employees in the Process Engineering Department – Ellor, Joseph Ryan, 61, Alicia Fazzie, 42, and Eric Mayo, 36. (McGarry Dep. p. 14, 33-34; Process Engineering Final Ladder Ranking.) In the ladder ranking McGarry prepared, Ellor ranked fourth. (Final Process Engineering

Ladder Ranking.) McGarry had not provided Ellor with a performance evaluation during his tenure in the Process Engineering Department. (McGarry Dep. p. 45.) In addition, McGarry does not appear to have used the outlined criteria for ladder rankings, having received no instruction as to factors to consider. (McGarry Dep. p. 28-29.) Rather, McGarry prepared his ladder ranking considering value to the Department, which he assessed based upon skill sets, and quality and quantity of output. (McGarry Dep. p. 28.)

> The justification given for Ellor's selection for layoff was:
>
> The reason for the reduction in force (RIF) activity is due to reduced client contract work. Indirect charging support staff will have to be reduced proportionately in parallel with reductions in direct charging staff. As a consequence this position has been eliminated. This action for John Ellor is based on coworker comparisons.

(Final Process Engineering Ladder Ranking.) McGarry testified that, although Ellor "did okay," "he didn't have the same skill set as [the other individuals in the Department]." (McGarry Dep. p. 21.) Specifically, the other three employees in the Department had strong technical writing and metrics skills, which Ellor did not have. (McGarry Dep. p. 22.) McGarry explained that the other three employees in the Department had skills in the following areas – the ability to build defect models, the ability to consult on the use of reengineering techniques to improve process

performance and product quality, the ability to build and apply complex measurement models, and the ability to develop, evaluate and implement enhancements to the measurement program – none of which Ellor possessed. (McGarry Dep. p. 54-57.)

MSE's stated justification for Ellor's termination was not entirely consistent over time. Compare Ex. P-1 at 29 (justification for Ellor's termination states his position was eliminated) with Def. Answers to Ellor's Interrogs. at 4, ¶1 (providing a long list of skills that Plaintiff Ellor purportedly "had not demonstrated . . . at the level of his co-workers" as justification for his termination). The justification in the final ladder ranking states that "[i]ndirect charging support staff" had to be reduced, and as a result Plaintiff Ellor's position was eliminated. Ex. P-1 at 29. However, Ellor was not "[i]ndirect charging support staff" and indirect charging was a "very small" part of his department. (McGarry Dep. p. 35-36.) As to the discrepancy, McGarry testified, ""[w]hether Ellor was charging contract or indirect dollars, you know, that, to me – the reason is the last sentence." (McGarry Dep. p. 35-37.)

When asked whether he disagreed with the order of the Process Engineering Department final January 2012 ladder ranking, Ellor answered that he did not know because he was not familiar with the capabilities of the

other employees in the Department. (Ellor Dep. p. 165-68; 173-74.) Ellor testified that he does not believe, however, that the highest ranked individual in his Department – Joseph Ryan – was "the most experienced and capable" person in the Department. (Ellor Dep. p. 168.) Following Ellor's layoff, his responsibilities were distributed among the remaining employees in the Department. (McGarry Dep. p. 23.)

When asked during his deposition whether he believed his age played a role in his position on the Process Engineering Department January 2012 final ladder ranking, he answered "I do not know." (Ellor Dep. p. 169.) When asked why he believes MSE discriminated against him based upon his age, Ellor testified that "the list of people [MSE] selected for layoff had an element of a pattern, an element of commonality, which showed that someone at MSE or the company selected or targeted people based on age." (Ellor Dep. p. 169.)

Ellor identifies Roger Hardy, age 46, Mark Andreassi, 40, Sharon McGinnis, 47, and Helene Pedata, 47, as individuals who were retained during the reduction in force and who were younger and less qualified that he was at the time of the layoff. (Ellor Answers to Interrogs. #11; Gwyn Decl. ¶ 7.) At the time of the 2012 reduction in force, Hardy and McGinnis were working as Section Managers in the WCS Department. (Gwyn Decl. ¶

8.) Similarly Andreassi was working as a Section Manager in the Technical Data Support ("TDS") Department, and Pedata was working as a Section Manager in the Command and Decision ("C&D") Department at the time of the 2012 reduction in force. (Gwyn Decl. ¶ 9, 10.) Notably, no WCS Section Managers were terminated in the RIF.  (Ex. P-1 at 36-37.)

MSE argues that Ellor cannot establish a *prima facie* case, but the Court has already determined that Plaintiffs' expert statistical report may be used to establish a *prima facie* case of discrimination. Turning to whether the legitimate, nondiscriminatory reasons given for Ellor's termination were pretextual, Ellor has argued that he was transferred out of his management position in the WCS Department to set him up as an easy target for termination. Considering the totality of the circumstances present, the Court finds that Ellor has met his burden of showing that a reasonable jury could find MSE's reasons for transferring and terminating him unworthy of credence. See Torre, 42 F.3d at 831 n.7, 834-35 (finding plaintiff created a material fact issue concerning whether he was transferred from his previous position to a dead-end job that had effectively been eliminated before he was transferred to it and concerning whether his transfer and termination were part and parcel of the same

allegedly discriminatory scheme). Therefore, summary judgment as to Ellor's claims is denied.

## F. The Weapons Control Systems Department

During the relevant time period, MSE maintained a Weapons Control System ("WCS") Department, which was responsible for developing the weapons control system on the AEGIS weapons system. (Nale Dep. p. 20.) From approximately 2001 until sometime after January 2012, Terrell "Scot" Nale was the WCS Department Manager. (Nale Dep. p. 15-16.) Nale reported to Director of Technical Operations William Goehrig who, in turn, reported to then-Senior Director George Reichl. (Nale Dep. p. 16; Goehrig Dep. p. 11-12; Reichl Dep. p. 16.) There were several Section Managers in the WCS Department, each of whom reported directly to Nale. (Nale Dep. p. 18-19.)

In the WCS Department, the Section Managers completed the performance appraisals for the employees who reported to them, and Nale reviewed the appraisals for form and content. (Nale Dep. p. 22-23.) The only performance appraisals Nale completed on his own were for his direct reports (the Section Managers). (Nale Dep. p. 22.) Goehrig reviewed and approved the appraisals for the WCS Department Section Managers, but he

had no involvement with the appraisals for the WCS Department
employees under the Section Managers. (Goehrig Dep. p. 21-22.)

In completing the WCS Department ladder rankings, Nale asked the
Section Managers to rank their direct reports, and Nale then consolidated
the rankings he received from the Section Managers to create a composite
ladder ranking for the entire WCS Department. (Nale Dep. p. 44-46.) In
creating the consolidated ladder ranking, Nale considered employees'
performance, skill sets, current contributions, what he believed the
employees would be able to contribute in the future, and ability to perform
in multiple roles. (Nale Dep. p. 46, 48.) After he completed his ladder
ranking, Nale met with Goehrig to review them. (Nale Dep. p. 49-50;
Goehrig Dep. p. 93.) Goehrig did not make any changes to the order of the
ladder ranking Nale prepared, nor did he direct Nale to make any changes
to it. (Nale Dep. p. 51; Goehrig Dep. p. 93-94.) Reichl also reviewed the
ladder rankings, but he did not make any changes to them. (Reichl Dep. p.
33-34.)

As stated above, however, Nale, identified five employees to be
terminated in the RIF in an e-mail to Goehrig, his Director, separate from
any ladder ranking. Ex. P-96; Nale Dep. p. 41-42. All five employees

identified by Nale for termination were in fact terminated in the RIF and over the age of 50. Ex. P-36; Ex. P-1.

There were 56 employees on the WCS Department ladder ranking used in the January 2012 reduction in force. (Goehrig Dep. p. 123-24; WCS Final Ladder Ranking.) Ultimately, Nale learned from Goehrig that six employees in the WCS Department would be laid off in the reduction in force. (Nale Decl. ¶ 2.)

**1. Frank Higgins** [Motion at docket entry 50]

Frank Higgins was employed by MSE and/or its predecessor for more than 30 years; he was 68 years old on the date of his termination. (Higgins Dep. p. 201.) At the time of his termination, Higgins was a Software Engineer Principal Leader in the Weapons Department supporting, generating, and maintaining the systems. (Higgins Dep. p. 175-180.)

Higgins had previously worked for CSC, from approximately 1973 until approximately 1978, when he resigned to take another job. (Higgins Dep. p. 32-33, 37-38.) He rejoined CSC in approximately 1982. (Higgins Dep. p. 86.) Higgins began working in the WCS Department sometime in approximately September 2001. (Higgins Dep. p. 94.) At the end of his employment, Higgins was in a systems support role. (Higgins Dep. p. 143, 145-46.) His main responsibility in 2011 was "cleaning up . . . data

dictionaries," and writing "scripts" for the program builds. (Higgins Dep. p. 282, 301-02.) Although Higgins cannot recall who his manager was in 2011, Section Manager Sharon McGinnis completed his performance appraisal. (Higgins Dep. p. 145-46, 276.) At the time of the RIF, Higgins reported directly to Nale. (Nale p. 15-16.)

In the ladder ranking Nale prepared, Higgins ranked 56th of the 56 WCS employees. (Nale Dep. p. 56; WCS Final Ladder Ranking.) The justification given for Higgins's selection for layoff was that:

> The skill set required to move into the future with MSE includes the following as well as the ability to perform duties in multiple roles and organizations: strong object orientation and Java programming skills, strong analysis/design/test/debug skills, ability to meet tight schedules and high productivity levels. Mr. Higgins has not demonstrated these abilities at the level of his co-workers as evidenced by department rankings. Therefore, there is not sufficient work for this employee.

(WCS Final Ladder Ranking.) After Higgins's termination, David Smart, 59, Leonid Kaplan, 63, and, Arthur Cooper, 52, assumed his job duties. (Def. Answers to Higgins's Interrogs. #5.)

Nale testified that while Higgins was capable of performing support work for the Department, he was incapable of performing the duties of a programmer, which was why he had been assigned a support role. (Nale

Dep. p. 30-33.) Nale explained that Higgins did not work well with certain of MSE's customer's employees. (Nale Dep. p. 43.)[23]

When asked whether there were any individuals ranked above him who were younger and less qualified than him, Higgins responded only that there were individuals ranked above him who were younger. (Higgins Dep. p. 305-06.) When asked whether he believes his position on the ladder ranking was motivated based on his age, he responded: "I don't know." (Higgins Dep. p. 306.)

Even though Higgins admits that he does not know whether there were individuals ranked above him on the ladder ranking who were more qualified than he was, he seemingly claims there were four individuals retained who were younger and less qualified or experienced than he was: Arthur Cooper, 52, Gary Custis, 60, Leonid Kaplan, 63, and David Smart, 59. (Higgins Dep. p. 300-01.) While Higgins claims he "could do anything

---

[23] Higgins had received an unsatisfactory performance appraisal in 2009, from a Section Manager who was no longer in the WCS Department at the time of the January 2012 reduction in force, stemming from a complaint the Company had received from its customer, Lockheed Martin. (Higgins Dep. p. 203, 243; Higgins 2009 Performance Appraisal.) Although Higgins contends that the Lockheed Martin engineer who complained about his work was "almost impossible to deal with," and disagrees that the engineer's complaint was valid, he does not dispute that the complaint was made and that the engineer and Higgins did not like each other. (Higgins Dep. p. 213-15.)

that [Cooper, Custis, Kaplan and Smart] did," he admits that none of these individuals were in the same position as he was at the time of the January 2012 reduction in force. (Higgins Dep. p. 301-02.) Higgins testified that Cooper, Custis, Kaplan and Smart were completing program builds at the time of the 2012 reduction in force, he was only writing "scripts" for the builds, though he had done builds in the past. (Higgins Dep. p. 175-80, 300-01.) Higgins testified that he "can't judge" whether these individuals were "better or worse" than he was. (Higgins Dep. p. 301.) Nale ranked Cooper, Custis, Kaplan and Smart above Higgins on the WCS Department ladder ranking because all four of them were responsible for completing program builds independently at the time, whereas Higgins was only in a support role. (Nale Decl. ¶ 1.)

MSE argues that Higgins is unable to establish a *prima facie* case of discrimination because he is unable to identify any similarly situated younger employees who were retained during the RIF. The Court finds that Higgins is entitled to the same inference of discrimination as the other Plaintiffs, and turns to whether he can show pretext.

When asked why he believes MSE discriminated against him based upon his age, Higgins stated that the individuals who were selected for termination "were all older employees." (Higgins Dep. p. 323.) Higgins also

testified that Section Manager Nick Petro, and perhaps Section Manager Jon Jacobs (though he could not recall for certain), commented "maybe half a dozen times over three or four years" that "he couldn't understand somebody who had all of the money that I had, why I didn't retire." (Higgins Dep. p. 295-96.) When asked when these comments were made, Higgins could not recall. (Higgins Dep. p. 296.) Higgins also stated that he was not offended by these comments, but took them as having come from a "close friend." (Higgins Dep. p. 297.) The Court finds that these stray comments do not establish pretext. They were not necessarily age based, and neither Section Manager completed Higgins' 2011 Performance Appraisal, which was done by Section Manager Sharon McGinnis, so the comments were made by non-decision makers.

The Court is troubled, however, by the e-mail from Nale to Goehrig identifying WCS employees to be terminated in the RIF separate from any ladder ranking. Ex. P-36; Nale Dep. p. 41-42. Five employees over age 50, including Higgins and Sklar, were marked for termination in the first round of layoffs and a sixth employee, age 65, was recommended for "round two. Ex. P-36. All six were in fact terminated in the RIF. Ex. P-1. While there is a Final WCS Ladder Ranking in the record, it omits ratings for all employees other than those to be terminated, who were all rated "3." Ex. P-1. Finally,

Nale acknowledged that he did not consider Higgins's Performance Appraisals in formulating the ladder ranking. (Nale Dep. p. 44, 67, 71.) Taken together with the rest of the record, the Court finds Higgins has met his burden of providing a basis on which a reasonable jury could disbelieve MSE's articulated age-neutral explanation for Higgins's layoff. As such, MSE's motion for summary judgment will be denied as to Higgins.

**2. Harvey Sklar** [Motion at docket entry 52]

Harvey Sklar was employed by MSE and/or its predecessor for over 30 years; he was 74 years old at the time of his termination. (Sklar Dep. p. 90.) At the time of his termination, Mr. Sklar was a Senior Computer Scientist in the WCS Department. (Sklar Dep. p. 36.)

Sklar had previously worked for CSC, from approximately 1970 until approximately 1984, when he left to start his own business. (Sklar Dep. p. 27, 28-29.) He rejoined CSC in approximately 1992. (Sklar Dep. p. 46.) Sklar began working in the WCS Department sometime in approximately 2006 or 2007. (Sklar Dep. p. 37.) In early 2011, Sklar reported to Albert John Ellor (then-WCS Department Section Manager). (Sklar Dep. p. 39, 59.) After Ellor transferred out of the WCS Department, Sklar began reporting to Section Manager Nicholas Petro, and he continued to report to

Petro until his (Sklar's) layoff. (Sklar Dep. p. 59.) At the time of the RIF,
Sklar reported to Nale. (Sklar Dep. p. 39; Nale Dep. p. 15-16.)

In the WCS Department, Sklar was performing the duties of test
support in the lab, meaning he provided support to the individuals who
were testing the computer software for problems. (Sklar Dep. p. 63-64;
Nale Dep. p. 27.) Sklar did not do any programming during the last five or
six years of his employment. (Sklar Dep. p. 66.) He has no experience with
object-oriented programming or Java. (Sklar Dep. p. 88, 121.)

Sklar's mid-2011 performance appraisal was completed by then-
Section Manager Ellor and approved by Nale. (Sklar Dep. p. 91; Sklar mid-
2011 Performance Appraisal.) On that appraisal, Sklar received an overall
rating of "3" or "Meets Expectations." (Sklar mid-2011 Performance
Appraisal.) Sklar signed the appraisal and testified that the appraisal "looks
good" to him, and he agrees with it. (Sklar Dep. p. 103-04.)

Petro, the Section Manager to whom Sklar was reporting at the time,
completed Sklar's end-of-year performance appraisal, and Nale approved it.
(Sklar Dep. p. 105-06; Sklar late 2011 Performance Appraisal.) Sklar
received an identical performance appraisal to the one he had received
earlier that year, indicating, "[t]he performance of this individual has
remained substantially unchanged," and stipulating that "their June 2011

performance ranking be extended to 31 December 2011." (Sklar late 2011

Performance Appraisal.) Sklar considers the appraisal to be an accurate

assessment of his performance. (Sklar Dep. p. 108.)

In the ladder ranking Nale prepared, Sklar ranked 54th of the 56

employees. (Final WCS Ladder Ranking.) The justification given for Sklar's

selection for layoff was that:

> The reason for the reduction in force (RIF) activity is due to
> reduced client contract work. The reduction required in this
> department is 6. The skill set required to move into the future
> with MSE includes the following as well as the ability to
> perform duties in multiple roles and organizations: strong
> object orientation and Java programming skills, strong
> analysis/design/test/debug skills, ability to meet tight
> schedules and high productivity levels. Mr. Sklar's duties were
> to support lab installation and integration activities for program
> site support. This task will be eliminated and handled along
> with existing programmer responsibilities. Therefore, there is
> not sufficient work for this employee.

(Id.) After his termination, Sklar's job duties were assumed by

Andrew Vicente, age 36. (Def. Answers to Sklar's Interrogs. #5.)

Sklar identified five individuals who were retained and were younger

and less qualified or experienced than he was: Kevin Wehlen, age 32,

Andrew Vicente, 36, Donald Sylvester, 50, Roger Hardy, 46, and Darnell

Peterson, 43. (Sklar Dep. p. 114, 115-16; Sklar's Answers to Interrogs. #10,

11.) At the time of the 2012 reduction in force, Hardy was a Section

Manager in the WCS Department,[24] and Sylvester was working in the

Engineering Technology and Innovation ("ET&I") Department. (Sklar Dep.

p. 58-59; Final WCS Ladder Ranking; Beck Decl. ¶ 5.) Sklar admits that

Wehlen was doing programming at the time of the 2012 reduction in force,

and that he is "not completely sure" what duties Vicente had at the time.

(Sklar Dep. p. 112-13.) He also testified that Peterson was more qualified

than he was in sailor procedures and sometimes mentored him. (Sklar Dep.

p. 84-85, 127.)

 Wehlen, Vicente and Hardy all received performance ratings of "2," or

"Occasionally Exceeds Expectations" in 2011. (Nale Decl. ¶ 2.) Sylvester

received a performance rating of "1" or "Consistently Exceeds

Expectations." (Beck Decl. ¶ 6.) Peterson did not receive a performance

rating in 2011 because he was on military leave at the time.

 Nale testified that he ranked Peterson over Sklar because "his skills in

the lab were much stronger" and "he was respected much more by the

customer for the support that he was able to give them." (Nale Dep. p. 85.)

Nale ranked Vicente higher than Sklar on the WCS Department ladder

ranking because Vicente had multiple skills sets and was performing both

programming and test support duties at the time, whereas Sklar was only

---

[24] Sklar never held a management position at MSE. (Nale Decl. ¶ 5.)

performing test support duties. (Nale Decl. ¶ 4.) Nale ranked Wehlen above Sklar on the WCS Department ladder ranking because he considered Wehlen to be a subject matter expert on legacy baseline issues, and because Wehlen had multiple skills sets and was performing both programming and test support duties at the time, whereas Sklar was only performing test support duties. (Nale Decl. ¶ 3.) Sklar disputes much of this reasoning.

When asked why he believes MSE discriminated against him based upon his age, Sklar claims there was a "pattern . . . that there were so many people that have been let go of a specific age." (Sklar Dep. p. 151.) Sklar also testified that months prior to the 2012 reduction in force, Knowles told Sklar that he would retire if he was his age, and asked Sklar how old he was and when he planned to retire, on one or two occasions. (Sklar Dep. p. 55-56, 68, 79-80.)[25]

Sklar also disagrees with his selection for layoff, alleging that he was more experienced, and therefore more valuable to MSE than the individuals he identifies as comparators. (Sklar Dep. p. 124-28.)

─────────────

[25] Sklar also alleges that he "had heard that a few months prior to the layoffs, comments were made at a high-level meeting that the company needed to get rid of older workers." (Sklar Dep. p. 166.) When asked to elaborate on this allegation, however, Sklar testified that he did not remember who told him about the alleged comments, and described them as "just general office talk" and "office prairie fire." (Sklar Dep. p. 166-67.)

Specifically, Sklar claims he was more valuable to MSE than the individuals he claims should have been selected for layoff over him because he had "many more years of experience in AEGIS" than they did. (Sklar Dep. p. 124.) Sklar contends he "could have been moved to another functionality [within MSE] and then . . . come back to [his prior position] when funding is available." (Sklar Dep. p. 140.)

MSE has assumed, for purposes of this Motion, that Sklar can establish a *prima facie* case, but disputes that its reasons for selecting him for layoff are a pretext for age discrimination. For the reasons discussed above regarding Plaintiff Higgins, the Court also finds a sufficient showing of pretext, and will deny MSE's motion for summary judgment as to Sklar.

## Conclusion

For the reasons articulated above, and incorporating the discussion held on the record during oral argument on these Motions, MSE's Motions for Summary Judgment as to the claims of Plaintiffs Barnes [31], Dallas [37], DiTullio [42], Ruvin [44], Natale [46], Marino [47] will be granted. The Motions for Summary Judgment as to the claims of Plaintiffs Burger [38], Ellor [41], Higgins [50], Sklar [52], and Perry [53] will be denied. An appropriate Order will be filed.

Dated: June 29, 2016                    /s/ Joseph H. Rodriguez
                                         JOSEPH H. RODRIGUEZ, USDJ